**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**William H. FAIRBANKS,
Defendant-Appellant.**

**No. 75–1432.**

United States Court of Appeals,
Tenth Circuit.

Argued and Submitted Feb. 26, 1976.

Sept. 7, 1976.

Rehearing Denied Oct. 6, 1976.

Certiorari Denied Dec. 6, 1976.
See 97 S.Ct. 532.

Appeal from the United States District Court for the District of Colorado.

Michael A. Williams, Denver, Colo., for defendant-appellant.

James P. Gatlin, Asst. U. S. Atty., Denver, Colo. (James L. Treece, U. S. Atty., Denver, Colo., on the brief), for plaintiff-appellee.

Before LEWIS, Chief Judge, and SETH and BARRETT, Circuit Judges.

LEWIS, Chief Judge.

Defendant Fairbanks was found guilty of having made false statements "for the purpose of influencing" the actions of a savings and loan association insured by the Federal Savings and Loan Insurance Corporation in violation of 18 U.S.C. §§ 1014, 2, 371. The issue on appeal is whether one's knowledge of the complicity of employees and officers of a federally-insured savings and loan association in a scheme of inflated construction loan disbursements indicates that he does not have the requisite intent to make false statements for the "purpose of influencing" the disbursement decisions of said savings and loan association in violation of section 1014. If so, the defendant argues that the trial court erroneously excluded evidence of such a complicity in the instant case.

Robert T. Irwin and Ray M. Bone, both Colorado Springs real estate developers, were involved in a multi-million dollar shopping center project. On May 1, 1973, Irwin and Bone entered into an owner-architect agreement with the defendant Fairbanks, a Colorado Springs architect. The architect's fees in this agreement amounted to $59,526. Sometime subsequent to the execution of the first agreement, Irwin and the defendant Fairbanks executed an identical owner-architect agreement, except the fees in the second agreement were inflated by 100 percent. Irwin testified that the purpose behind the second agreement was to allow them to prepare inflated draw requests and use the excess loan disbursals on other developments.

Irwin and Bone borrowed $3,400,000 from Security Savings and Loan Association in Colorado Springs for the shopping center project. The loan funds were placed in a special account and were to be disbursed during the course of the construction project as costs arose. Irwin and Bone were to submit loan disbursement requests, containing an itemization of costs incurred and the payee, plus documentation supporting the costs, usually submitted in the form of invoices from the subcontractors and suppliers. Security Savings' construction loan department would then compare the disbursement requests with a cost breakdown of the project, would sometimes conduct a field inspection, and would examine the invoices before approving the disbursal.

Evidence indicated that at the request of Irwin and Bone, Fairbanks would submit inflated invoices for his architectural services to Irwin and Bone. The developers would then prepare a loan disbursement request, append a copy of Fairbanks' inflated invoice, together with a copy of a check payable to Fairbanks in the amount of the invoice, and submit the request to Security Savings. After approval of the disbursement request, Security Savings would send Irwin and Bone a check for the total amount. Then, having written void on the original check made payable to Fairbanks, Irwin and Bone would give Fairbanks an-

other check for the sum actually owing instead of the inflated sum. During the course of the construction, Security Savings changed this process somewhat requiring Irwin and Bone to submit their original checks payable to the suppliers with the disbursement request and the invoices. After Security Savings approved the disbursement request, it would send Irwin and Bone's original check directly to the suppliers, in this case Fairbanks. When this was done, either Fairbanks would bring the original check to Irwin and Bone and exchange it for a check in the amount actually owing or someone would exchange the checks at Fairbanks' office.

Although it was established that Fairbanks did not receive more money than he was entitled to, his participation in the scheme seemed to be in consideration for prospective architectural work on other development projects. Fairbanks' own testimony before the grand jury indicated that he knew the purpose and use of his inflated invoices and voluntarily participated in the scheme.

Fairbanks' contention on appeal is that his knowledge of the complicity of several of the officers of Security Savings in the scheme of inflated loan disbursements somehow prevented him from having the "purpose of influencing" the actions of Security Savings necessary for a conviction under 18 U.S.C. § 1014 and that the court erred in excluding evidence of this complicity. In support of this position, Fairbanks relies on our decision in *United States v. Kramer,* 10 Cir., 500 F.2d 1185, wherein we held the evidence insufficient to convict a bank president "of aiding, abetting, inducing and procuring" a false financial statement from a customer for the purpose of influencing the actions of a federally-insured bank in violation of 18 U.S.C. § 1014. *Kramer,* a case limited by the peculiarity of its facts, involved a financial statement, false in substance but not proven by the Government to be known to be false by the defendant nor in any way a limitation on the defendant president's unrestricted authority to grant the loan. The loan was not

one subject to review by the board of directors, was not reviewed before it was granted, and the board's subsequent approval was merely perfunctory in nature. *Kramer* involved a single bank officer with complete discretion over the issuance of a loan, who was allegedly "influenced" by a false financial statement that he had "induced" a third party to make. Our holding in *Kramer* is simply that the defendant there was not influenced by his own actions within the meaning of the penal statute. Such is not the case at bar.

In this case there is some indication of possible complicity and self-dealing by several, but not all, employees of Security Savings responsible for processing the loan and loan disbursements. For example, Raymond C. Rennerberger, the son-in-law of the president of Security Savings, was an undisclosed partner in the shopping center project. Also, Mike Hinton, Security Savings' loan officer for this particular loan, was involved in several joint ventures with Irwin and Bone. Irwin testified that some of the diverted funds were used on the projects in which Hinton was participating.

Several cases have held that some knowledge and complicity on the part of bank officers or employees is not enough to avoid conviction under 18 U.S.C. § 1014 for having made false statements to a federally-insured bank "for the purpose of influencing" some action of the bank. *United States v. Braverman*, 7 Cir., 522 F.2d 218, *cert. denied*, 423 U.S. 985, 96 S.Ct. 392, 46 L.Ed.2d 302; *United States v. Tokoph*, 10 Cir., 514 F.2d 597; *United States v. Niro*, 2 Cir., 338 F.2d 439. Typical of these cases is *Niro*, where the defendants argued that since the president of the savings and loan institution had participated in the fraudulent scheme, their false statements could not have been made "for the purpose of influencing" any action of the savings and loan. The court, however, concluded otherwise, stating:

> The words "for the purpose of influencing" were included in the statute to define the quality of the required intent, not to immunize a party from criminal liability because an officer of the bank was involved in the fraudulent scheme. *United States v. Niro, supra*, at 441.

As we have indicated, the financial statement in *Kramer* was not used to influence the approval of the loan by the board of directors, since the board's approval was made after the fact and was "little more than a mere formality." *Id.* at 1188. The fraudulent schemes in the other cases, and here, needed more than merely the approval of the bank officer participating in the scheme. For example, in *Niro*, even though the president of the association was participating in the fraudulent scheme, the loan not only needed his approval, but also the approval of the board of directors, who knew nothing of the false statement. In the instant case, Hinton, the loan officer in charge of Irwin and Bone' construction loan, apparently was aware of the inflated disbursement requests. Also, the president of Security Savings, Connover, may have been aware of the scheme. But even if the complicity of Hinton and Connover were clearly established, this alone would not be enough to bring this case within our holding in *Kramer*. Here, unlike *Kramer*, there were other employees who participated in the loan and the loan disbursals who were totally unaware of the inflated invoices and disbursement requests. Roger Lane, the executive vice-president of Security Savings and a member of the loan committee that granted approval for the $3,400,000 loan, testified that he was unaware of the inflated loan disbursement requests. Likewise, George Organ, a loan disbursing officer in Security Savings' construction loan department, stated that he had no reason to doubt the validity of the Fairbanks' invoices that accompanied the loan disbursement requests and relied on them in making disbursements. Thus, in spite of Fairbanks' apparent knowledge of the possible complicity of several of the officers of Security Savings in the scheme of inflated loan disbursals, the complicity was not sufficient to prevent the jury from finding that Fairbanks had the "purpose of influencing" the actions of Security Savings required for conviction under 18 U.S.C. § 1014.

Finally, there is no indication at all that the trial court excluded any evidence pertaining to the alleged complicity of employees and officers of Security Savings. Defense counsel was permitted on several occasions to ask questions concerning the complicity. In fact, the court permitted the defense to call both Hinton and Connover as witnesses and in no way circumscribed the defense's examination of these witnesses.

The judgment is affirmed.