UNITED STATES of America,
Plaintiff-Appellee,

v.

J. Joseph KENNEDY,
Defendant-Appellant.

UNITED STATES of America,
Plaintiff-Appellee,

v.

Robert J. MYERS, Defendant-Appellant.

UNITED STATES of America,
Plaintiff-Appellee,

v.

Lawrence F. CARLSON,
Defendant-Appellant.

Nos. 76–1333, 76–1238 and 76–1880.

United States Court of Appeals,
Ninth Circuit.

Nov. 28, 1977.

Rehearing and Rehearing En Banc
Denied Jan. 18, 1978.

Joe Reichmann (argued), Gregory A. Wedner (argued), Los Angeles, Cal., W. Bryan Osborne (argued), San Diego, Cal., for defendants-appellants.

Leonard Sharenow (argued), Los Angeles, Cal., for plaintiff-appellee.

Before GOODWIN and KENNEDY, Circuit Judges, and McNICHOLS, District Judge.*

McNICHOLS, District Judge:

Appellants, with eleven other persons,[1] were each named in some counts of a forty-county indictment charging conspiracy and substantive offenses relating to an overall scheme to obtain money from a federally-insured bank for the purpose of funding the purchase of an insurance business chartered in the State of Washington. A jury trial ensued and appellants were each found guilty of one or more offenses.[2] Each perfected an appeal from the judgment of conviction, and the Government moved to consolidate these appeals, which motion was granted.

J. Joseph Kennedy ("Kennedy"), a licensed attorney, was charged in Count Five with making false statements on a bank loan application (18 U.S.C. § 1014; § 2); in Count Six with aiding and abetting the misapplication of bank funds (18 U.S.C. § 656; § 2); and in Count Seven with aiding and abetting the making of false entries on bank records (18 U.S.C. § 1005; § 2). He was convicted on all counts and sentenced to one-year imprisonment and assessed a fine of $5,000. The term of imprisonment was suspended and the appellant placed on probation.

Robert J. Myers ("Myers"), who did not testify but is apparently not gainfully employed (on a loan application his employment is listed as "philosopher" and his employer as "Humanity"), was charged in Count Twenty-two with making a false statement on a loan application (18 U.S.C. § 1014; § 2); in Count Twenty-three with aiding and abetting the misapplication of bank funds (18 U.S.C. § 656; § 2); and in Count Twenty-four with aiding and abetting the making of false entries on bank records (18 U.S.C. § 1005; § 2). He was found guilty on all three counts, was fined $1,000, and placed on probation for three years.

Lawrence F. Carlson ("Carlson"), who did not testify but apparently acted as an unpaid assistant to a man named Russell, who in turn was a stock and insurance promoter with a felony record (Carlson's counsel described Carlson as a "gopher"—one who runs errands), was charged in Count One with conspiracy (18 U.S.C. § 371; § 2); in Count Seventeen with false statement of a loan application (18 U.S.C. § 1014; § 2); and in Count Eighteen with aiding and abetting the misapplication of bank funds (18 U.S.C. § 656; § 2). He was convicted of Count One; acquitted of Count Eighteen; and the jury was unable to reach a verdict as to Count Seventeen, leading to a mistrial as to that count. Carlson was the only one of the three defendants ordered imprisoned. He was sentenced to two years' imprisonment, plus a $5,000 fine.

Some factual background common to all three appeals will serve to put the respective claims of error in perspective.

In the summer of 1973 Herbert Adair ("Adair"), a co-indictee who pled guilty to several counts, including conspiracy, began negotiations to purchase an insurance company chartered in the State of Washington under the title "General Security Life Insurance Company" ("General Security Life"). Adair was unable to raise sufficient capital to consummate the purchase. He contacted Eugene A. Kramer, another indictee, who has heretofore pled guilty to conspiracy, and who was a vice president and loan officer employed by the Bank of America ("bank"). Kramer had authority to grant loans on behalf of the bank up to $25,000 on each loan without further approval. It was therefore agreed that Adair would secure a number of individual bor-

---

* Honorable Ray McNichols, Chief Judge, United States District Court for the District of Idaho, sitting by designation.

1. Of the fourteen persons indicted, eight pled guilty, five went to trial, including the three appellants, and one is a fugitive.

2. The jury found co-defendant Herman F. Hoffman innocent and was unable to agree on a verdict as to co-defendant John R. Myers.

rowers ("nominees") who would apply for loans which Kramer would approve. The nominees were to turn the proceeds of such loans over to Adair, ostensibly to be used to obtain control of General Security Life. Kramer was to receive the sum of $15,000 for his part in the arrangement.

A number of persons, including those indicted in this case, as such nominees, thereafter were severally brought by Adair to Kramer's desk at the bank where false and misleading loan applications were executed, the loans approved, and the funds eventually funneled to Adair. Such was the scheme from which the charges arose. We turn now to the appeals of the individual appellants.

### APPEAL OF J. JOSEPH KENNEDY, No. 76–1333

Kennedy, a practicing attorney, had represented Adair in legal matters. Adair approached Kennedy and requested him to act as a borrower. Kennedy agreed to do so, extracting in return a commitment from Adair for future retainers for legal services. Adair accompanied Kennedy to the bank, where a loan of $25,000 from the bank to Kennedy was arranged. The loan application form grossly overstated Kennedy's financial condition. Kennedy indicated to Kramer that the purpose of the loan was to purchase certain condominium property. This purported purpose of the loan was, by Kramer, entered into the bank's records. All three persons involved in the loan knew this representation to be false. Kennedy turned the proceeds of the loan over to Adair. A week later Kennedy became a member of the Board of Directors of General Security Life, and soon thereafter of the Board of Directors of another insurance company which Adair was negotiating to acquire.

Kennedy was charged with, and convicted of, the three counts heretofore described, i. e., (1) false statements on the bank loan application; (2) aiding and abetting Kramer in the misapplication of bank funds; and (3) aiding and abetting Kramer in making false entries on bank records.

Appellant Kennedy relies on several citations of error to support reversal of the judgment of conviction.

1. The first ground alleges that there was an impermissible joinder of defendants in the indictment under Rule 8(b), F.R. Cr.P., and that the Court below erred in denying appellant's motion to sever on that ground in accordance with Rule 14, F.R. Cr.P.

2. Secondly, error is predicated on the manner in which the U.S. Attorney presented evidence involving Kennedy to the grand jury. It is claimed that certain exculpatory evidence was excluded from grand jury consideration.

3. Next, appellant objects to the manner in which the trial jury was instructed relative to separate treatment of the evidence as to each defendant.

4. And, finally, appellant contends that the Court erred in rejecting a requested instruction purporting to present a theory of defense.

The first ground relied upon by Kennedy involves a consideration of Rule 8(b), F.R. Cr.P. Appellant claims to have been improperly joined in the indictment with the other defendants. He contends that, since he participated only in his own loan application, he was not a participant in a series of acts or transactions so as to permit joinder with the other persons accused in the single indictment. Rule 8(b) authorizes the charging of multiple defendants in one indictment where they are alleged to have participated in a series of acts or transactions constituting an offense or offenses. The trial judge carefully considered the issue and determined that the joinder was proper. We agree.

Kennedy's activities in applying for and obtaining a loan, the proceeds of which went to Adair, were clearly part of a series of transactions calculated to carry out a common plan which formed the basis of the offenses.

"It is implicit in the language of Rule 8(b) that so long as all defendants partici-

pate in a series of acts constituting an offense or offenses, the offenses and the defendants may be joined even though not all defendants participated in every act constituting each joined offense." *United States v. Roselli,* 432 F.2d 879, 899 (9th Cir. 1970), *cert. denied,* 401 U.S. 924, 91 S.Ct. 883, 27 L.Ed.2d 828 (1971).

When this standard is applied to the facts of the case it is evident that the joinder complained of was proper.

 Appellant urges alternatively that if joinder was authorized, then the Court erred in rejecting his timely requests for severance[3] under Rule 14, F.R.Cr.P. Rule 14 provides that where it appears that a defendant may be prejudiced by a joint trial with other defendants, the Court may grant the defendant a separate trial. By the language of Rule 14 the matter is left to the sound discretion of the trial judge, to be exercised in the light of the potential prejudice to the defendant on the one hand and the obvious interest of judicial economy on the other. *United States v. Brashier,* 548 F.2d 1315 (9th Cir. 1976), *cert. denied,* 429 U.S. 1111, 97 S.Ct. 1149, 51 L.Ed.2d 565 (1977). The standard of review is abuse of discretion. Reversal is only appropriate upon a showing that the Court below abused its discretion in refusing to grant the motion to sever. *United States v. Campanale,* 518 F.2d 352, 359 (9th Cir. 1975), *cert. denied, Grancich v. United States,* 423 U.S. 1050, 96 S.Ct. 777, 46 L.Ed.2d 638 (1976). Appellant has the difficult burden of demonstrating prejudice and the ruling of the trial court will seldom be overturned on appeal. *Id.*

 Here the claim of prejudice is based upon the fact that because a conspiracy was charged (Kennedy was not specifically named as a conspirator), much hearsay evidence could be expected to be admitted. Likewise, he pointed out that great portions of the evidence admitted to prove the numerous counts would be inapplicable to him, but would have a prejudicial effect. He contends that "the government's ploy was to infect each defendant with the acts and transgressions of the other defendants", and that a "parade of horribles" would be admitted against the only conspirator on trial (Carlson) which would never come to the attention of the jury if he were tried alone. It is not surprising that a defendant might prefer to be tried separately so that only evidence admissible strictly against him would be heard by the jury. However, if this formed the only basis for prejudice required for severance, the consequent volume of separate trials of multiple actions in a series of similar and connected illegal transactions would create an intolerable burden on the trial courts. Serious consideration is properly to be given to the factor of judicial economy by the trial court in the exercise of its discretion when severance is sought.

 In the instant case, after denying severance, the trial judge took pains to alleviate the potential for prejudice inherent in the joint trial. He carefully and frequently advised the jury that evidence admitted solely against one defendant was not by the jury to be considered in determining the guilt or innocence of any other defendant. As such evidence was presented, he meticulously pointed out to the jury the limited purpose for which it was admitted. In the Court's instructions the nature of the separate charges against the individual defendants was fully explained. The jury was emphatically instructed that the guilt or innocence of each defendant was to be judged solely on the facts admitted against that defendant without consideration as to its finding as to other defendants.

It is enlightening to note that of the five defendants jointly tried, one was acquitted completely; the jury was unable to agree on any of the three counts charged against a second defendant; as to a third, he was acquitted on one count, found guilty on another, and the jury was unable to agree on a third count. The other two defendants, including Kennedy, were each found guilty on each of the three counts charged. This, we believe, dramatically demonstrates

---

**3.** Appellant moved for severance prior to trial and renewed the motion during trial.

that the jury was able, under the careful instructions of the Court, to understand and separate the evidence as to each defendant and to individually determine the issues presented.

We are fully persuaded that the record demonstrates no abuse of discretion in the denial of severance.

Kennedy next focuses on his contention that the indictment should have been dismissed for failure of the United States Attorney[4] to bring to the attention of the grand jury certain matter which appellant categorizes as exculpatory evidence. Thus is raised an issue that has given us trouble.

The record reflects that Kennedy appeared before the grand jury and freely gave testimony. Subsequently the United States Attorney advised Kennedy of the probability that he would be indicted. In an attempt to avoid indictment, an attorney representing the appellant sought to have the Government attorney present additional information to the grand jury. To this end, affidavits of other participants[5] in the attempt to purchase the Washington insurance company were submitted. Also, the United States Attorney was advised of the availability of a polygraph test taken by Kennedy. The gist of the affidavits and the polygraph was to show (1) that appellant had not read the false bank loan application before he signed it, (2) that Adair prepared the application and mistakenly overstated Kennedy's assets, and (3) that Kennedy was not promised any reward by either Adair or Russell for obtaining the loans. It appears to be established that the United States Attorney did not present this information or the potential sources of information to the grand jury.

A motion was made, on behalf of appellant, praying for dismissal of the indictment on the ground that the same was obtained in "abuse of his Fifth Amendment right to an indictment by a reasoned and informed grand jury". The question was fully briefed and argued, and the Court denied the motion.[6]

Appellant cites a number of United States Supreme Court cases as authority for holding that the trial court erred. While certain carefully culled language from these cases appears to give some support to appellant's contention, an examination indicates that no one of the cases so hold.

*Wood v. Georgia,* 370 U.S. 375, 82 S.Ct. 1364, 8 L.Ed.2d 569 (1962), was a state contempt action arising out of public criticism of a state judge for impanelling an investigative grand jury. *United States v. Dionisio,* 410 U.S. 1, 93 S.Ct. 764, 35 L.Ed.2d 67 (1973), considered only the power of a grand jury to force a witness to provide voice recordings. *Costello v. United States,* 350 U.S. 359, 76 S.Ct. 406, 100 L.Ed. 397 (1956), is the bellwether case in which the Supreme Court authorized the use of indictments based solely on hearsay evidence. Actually *Costello* appears to be unfavorable to appellant as we will later indicate. *Stirone v. United States,* 361 U.S. 212, 80 S.Ct. 270, 4 L.Ed.2d 252 (1960), held that a variance between the offense charged in the indictment and that proved at trial was fatal and could not be corrected by court amendment.

As further precedential authority, appellant relies on a district court decision from the Central District of California, a court of appeals case from this circuit, and a California state court case. We examine these seriatim:

*United States v. DeMarco,* 401 F.Supp. 505 (C.D.Cal.1975), was a case in which the trial judge dismissed an indictment on multiple grounds. One of the stated reasons for dismissal was that the United States officials had a wrongful motive in presenting the case to the grand jury and did not disclose this motive to the grand jury. It was shown that the indictee, DeMarco, was initially charged in the federal court in

---

**4.** When referring to the United States Attorney we mean the Assistant U. S. Attorney or attorneys assigned to the case.

**5.** Adair and Russell, both of whom were target individuals in the grand jury investigation.

**6.** Initially on October 7, 1975, prior to trial, the Court orally denied the motion. C.T. 281. On December 17, 1975, after the trial, he entered a written order explicating his reasoning. C.T. 497, *et seq.*

Washington, D. C., but claimed a right to be tried in his home state of California. Government prosecutors threatened to present more serious charges in California unless DeMarco waived his right to transfer the case for prosecution in California. He refused and the case was transferred to California. The United States Attorney then, as the Court determined, in retaliation, presented the more serious charge to the grand jury and obtained the challenged indictment. None of this background motivation was disclosed to the grand jury. *DeMarco* was affirmed by this court, but on a different ground than that above related. *United States v. DeMarco*, 550 F.2d 1224 (9th Cir. 1977).

*United States v. Basurto*, 497 F.2d 781 (9th Cir. 1974), represents a holding of this court authorizing a trial court to dismiss an indictment when it is discovered prior to trial, and before jeopardy has attached, that perjured testimony as to a material issue had been presented before the grand jury. It is of passing interest to note that the district judge who authored *United States v. DeMarco, supra,* at the trial level, wrote for this court in *Basurto*. This case is clear authority for dismissal of an indictment by a trial judge where the quality of the evidence presented to the grand jury is in question. A majority of the panel found the authority under the Due Process Clause of the Fifth Amendment. The concurrence would place that authority on the supervisory power of the courts in the administration of the criminal justice jurisdiction. It must be emphasized that *Basurto* deals with a case of undisputed perjury by the key witness presented to the grand jury.

*Johnson v. Superior Court of San Joaquin County*, 15 Cal.3d 248, 124 Cal.Rptr. 32, 539 P.2d 792 (1975), was before the court on a writ of prohibition. The Court found that the prosecuting attorney had initially charged Johnson by information but that a magistrate at preliminary hearing dismissed the complaint. The prosecutor then presented the matter to the state grand jury. He did not disclose to the grand jury that based on Johnson's testimony the magistrate had dismissed. On this state of the facts the Court prohibited prosecution under the indictment, without prejudice to the district attorney's continuing the prosecution by seeking another indictment. In its discussion the California Supreme Court makes it clear that it was interpreting a state statute[7] and did not reach the proposed constitutional issue of due process. The Court interpreted the state statute as requiring the district attorney to present all exculpatory evidence known to him.

There is additional case law available for our guidance which bears strongly on the issue to be decided.

In a very early case the United States Supreme Court dealt with an analogous situation. *Holt v. United States*, 218 U.S. 245, 31 S.Ct. 2, 54 L.Ed. 1021 (1910). There it was contended that a witness before a grand jury had testified to certain damaging admissions purportedly made by the accused. The witness withheld from the grand jury the fact that the admissions were obtained under circumstances that made them incompetent for use at trial. It was apparent that without the admissions there was little evidence against the defendant. The court below refused to quash the indictment and denied a motion in arrest of judgment. *United States v. Holt*, 168 F. 141 (W.D.Wash. 1909). The Supreme Court refused to reverse, holding:

"Without considering how far, if at all, the court is warranted in inquiring into the nature of the evidence on which a grand jury has acted, and how far, in case of such an inquiry, the discretion of the trial court is subject to review (*United States v. Rosenburgh*, 7 Wall. 580, 19 L.Ed. 263) it is enough to say that there is no reason for reviewing it here. All that the affidavit disclosed was that evidence in its nature competent, but made incom-

7. "The grand jury is not required to hear evidence for the defendant, but it shall weigh all the evidence submitted to it, and when it has reason to believe that other evidence within its reach will explain away the charge, it shall order the evidence to be produced, and for that purpose may require the district attorney to issue process for the witnesses." Cal.Penal Code § 939.7 (West).

petent by circumstances, had been considered along with the rest. *The abuses of criminal practice would be enhanced if indictments could be upset on such a ground."* [Citations omitted.] [Emphasis supplied.] *Holt v. United States, supra,* 218 U.S. at 247–248, 31 S.Ct. at 4.

Forty-six years later the Supreme Court citing *Holt, supra,* rejected an invitation to exercise the power of supervision over the administration of justice in the federal courts by adopting a rule permitting defendants to challenge indictments on the ground that they are not supported by adequate or competent evidence. *Costello v. United States, supra.* While the thrust of the Opinion was to authorize the use of hearsay evidence as a sole basis for indictment by a grand jury, the fact that the Court relied on *Holt* causes the language of the Court to be most helpful here. We are instructed on the guidelines to be considered where the indictment is sought to be brought under attack. The Court having reviewed the *Holt* holding, said:

"The same thing is true where as here all the evidence before the grand jury was in the nature of 'hearsay.' If indictments were to be held open to challenge on the ground that there was inadequate or incompetent evidence before the grand jury, the resulting delay would be great indeed. The result of such a rule would be that before trial on the merits a defendant could always insist on a kind of preliminary trial to determine the competency and adequacy of the evidence before the grand jury. This is not required by the Fifth Amendment. An indictment returned by a legally constituted and unbiased grand jury, like an information drawn by the prosecutor, if valid on its face, is enough to call for trial of the charge on the merits. The Fifth Amendment requires nothing more.

"Petitioner urges that this Court should exercise its power to supervise the administration of justice in federal courts and establish a rule permitting defendants to challenge indictments on the ground that they are not supported by adequate or competent evidence. No persuasive reasons are advanced for establishing such a rule. It would run counter to the whole history of the grand jury institution, in which laymen conduct their inquiries unfettered by technical rules. Neither justice nor the concept of a fair trial requires such a change. In a trial on the merits, defendants are entitled to a strict observance of all the rules designed to bring about a fair verdict. Defendants are not entitled, however, to a rule which would result in interminable delay but add nothing to the assurance of a fair trial." [Footnote omitted.] *Costello v. United States,* 350 U.S. at 363–364, 76 S.Ct. at 408–09.

After the passage of still another twenty years, the problem faced the Court of Appeals for the Sixth Circuit in a case remarkably similar to the instant case. *United States v. Ruyle,* 524 F.2d 1133 (6th Cir. 1975), *cert. denied,* 425 U.S. 934, 96 S.Ct. 1664, 48 L.Ed.2d 175 (1976). In this case an accused was charged with unlawful distribution of a controlled substance. A narcotics agent testified before the grand jury as to the details of the offense. However, the jury was not advised, though Government counsel apparently well knew, that the defendant was actually a registered distributor licensed to distribute such controlled substances. It appears that the ultimate proof showed the distribution to be outside of the authorization and unlawful. Defendant moved to have the indictment dismissed on the ground that evidence tending to exculpate him was withheld from the grand jury. The trial judge denied the motion and the circuit court affirmed, relying on *Costello, supra.* The circuit court said:

"The function of a grand jury is investigative. Its proceedings are not adversary in nature, but rather consist of inquiries conducted by laymen without resort to the technicalities of trial procedure. [Citations omitted.] * * * The indictment in the present case was valid on its face and the defendant was not entitled to challenge it on the ground that information which he considered favorable to his defense was not presented to the grand jury." *United States v. Ruyle, supra* at 1135–1136.

We believe that the rule to be distilled from the authorities discussed must be that only in a flagrant case, and perhaps only where knowing perjury, relating to a material matter, has been presented to the grand jury should the trial judge dismiss an otherwise valid indictment returned by an apparently unbiased grand jury. To hold otherwise would allow a minitrial as to each presented indictment contrary to the teaching by Mr. Justice Black in *Costello, supra.* We find ourselves in agreement with the Sixth Circuit holding in *Ruyle, supra.*

Under the facts presented in this case, the trial judge did not err in denying appellant's motions to dismiss the indictment.

Appellant mounts a vigorous attack on the instructions as given by the Court in directing that the jury separately consider the guilt or innocence of the appellant apart from that of the other defendants. Appellant proposed a series of nineteen instructions designed to advise the jury how to consider the evidence as it related to the appellant only. The trial court refused to give the proposed instructions in the form offered but carefully instructed the jury on all applicable points. As pointed out above in the discussion of the severance for separate trial issue, the instructions given were wholly adequate.

A Court is not required to give requested instructions where the charge as a whole fairly and adequately covers the points involved. *United States v. Valenzuela-Mendoza,* 452 F.2d 773, 774 (9th Cir. 1971); *United States v. Harvey,* 428 F.2d 782, 784 (9th Cir. 1970).

As indicated in the prior discussion we find after careful review that the Court fully and correctly instructed the jury. Appellant was entitled to no more and no error occurred as a result of the refusal to give the requested instructions.

This appellant attempts to show reversible error in the rejection of an instruction offered which purportedly covered Kennedy's "theory of the case". This instruction was directed only at Counts Six and Seven where violations of 18 U.S.C. § 656; § 2 and 18 U.S.C. § 1005; § 2, respectively, were alleged. These were the charges of aiding and abetting the bank officer, Kramer, in the misapplication of bank funds (18 U.S.C. § 656; § 2) and in the making of false entries in bank records (18 U.S.C. § 1005; § 2). The theory of the defense is best illustrated by a quotation from the proposed instruction:

"During the trial there have been repeated references to the term nominee borrowers. This term is used to reflect a situation where a person borrows money from a bank and in turn loans this money to a third party. *In such a situation, if the bank is relying upon the financial condition and the ability of the nominee borrower to repay the loan and the borrower has both the intention and the ability to repay that loan then such a loan in itself does not constitute a violation of the law.*"

In other words, appellant contends that where a borrower is financially able to repay a loan and understands that he is responsible for repayment he cannot be convicted under 18 U.S.C. § 656 even though the bank official is aware that he proposes to simultaneously turn the proceeds over to a third party.

There is some support for this concept in cases relied upon by appellant from the First and Second Circuits. *United States v. Gens,* 493 F.2d 216 (1st Cir. 1974); *United States v. Docherty,* 468 F.2d 989 (2d Cir. 1972).

In *Docherty,* the defendant was a boyhood friend of a bank officer. At the request of the bank officer he routinely signed notes in blank with the understanding the the banker would fill in the amounts and himself use the proceeds. Defendant understood that this gave the banker an otherwise unavailable opportunity to borrow from his own bank. Defendant believed the notes to be paid regularly which was not the case. Defendant was charged with aiding and abetting the banker in misapplication of bank funds, 18 U.S.C. § 656 (as in this case). The defendant was convicted below but the conviction was reversed by the appeals court. The Court found no evidence to show that Do-

cherty was aware that the bank officer was effecting a conversion. This, the Court thought, was essential to convict one of aiding and abetting under 18 U.S.C. § 656. It will be thusly observed that *Docherty* is quite distinguishable on its facts. However, some of the language used by the Court is troublesome. At page 995, the Court said:

"Here there was clearly no sufficient evidence of intent to 'injure' the bank. Docherty knew he was putting his own credit on the line, and it is not suggested that he lacked the means to repay. * * Finally, there was no intent to deceive a bank officer or examiner. Docherty's failure to disclose the true recipient of the proceeds of the loan cannot be considered a deceit when, as we have held, he made no false statement of his purpose for the loan."

A strong dissent criticized the reasoning of the Court and in so doing indicated the view that the correct interpretation of the law was to be found in a Ninth Circuit case, *Hargreaves v. United States*, 75 F.2d 68 (9th Cir. 1935), *cert. denied*, 295 U.S. 759, 55 S.Ct. 920, 79 L.Ed. 1701 (1935).

*Gens, supra,* was quite similar in facts to the defendant's theory of this case. Gens owned a group of nursing homes. He had aided his co-indictees in gaining control of a bank. Thereafter the bankers loaned large sums to individuals procured by Gens who, to the bankers' knowledge, proposed to turn the funds over to Gens. The Court assumed from the record that the borrowers were eligible on their own credit for such loans. Convictions below were reversed. The Court at page 222, relying heavily on *Docherty, supra,* gave its announced holding upon which appellant herein relies:

"On the other hand, where the named debtor is both financially capable and fully understands that it is his responsibility to repay, a loan to him cannot—*absent other circumstances*—properly be characterized as sham or dummy, even if bank officials know he will turn over the proceeds to a third party. Instead, what we really have in such a situation are two loans: one from the bank to the named debtor, the other from the named debtor to the third party. The bank looks to the named debtor for repayment of its loan, while the named debtor looks to the third party for repayment of his loan. If for some reason the third party fails to make repayment to the named debtor, the latter nonetheless recognizes that this failure does not end his own obligation to repay the bank. In this situation, the bank official has simply granted a loan to a financially capable party, which is precisely what a bank official should do. There is no natural tendency to injure or defraud the bank, and the official can not be said to have willfully misapplied funds in violation of § 656." [Citations omitted.] [Emphasis supplied.]

As indicated in the italicized portion of the above quote, even the *Gens* Court would likely find otherwise if "other circumstances" were shown. Other circumstances might well be such matters as false applications, misstated purposes of the loan and the like. To that extent it appears that *Gens* may be distinguished.

■ However, the basic weakness in appellant's position is that neither *Docherty* nor *Gens* is good law in this circuit. Under the teaching of *Hargreaves, supra,* the misapplication of funds proscribed by 18 U.S.C. § 656[8] occurs when funds are distributed under a record which misrepresents the true state of the record with the intent that bank officials, bank examiners, or the Federal Deposit Insurance Corporation will be deceived. Here the undisputed evidence shows that in truth the funds were borrowed for Adair, using Kennedy as a sham borrower. This is clearly a violation of 18 U.S.C. § 656 under the holding of *Hargreaves.*

Since the proposed instruction did not correctly state the law, the Court properly rejected it.

Kennedy has demonstrated no error sufficient to warrant reversal and the judgment appealed from should be affirmed.

8. At the time of *Hargreaves*, § 656 was codified as 12 U.S.C. § 592.

**1340**

## APPEAL OF ROBERT J. MYERS, No. 76–1238

Myers was contacted by Adair and sent to Kramer at the bank to obtain a loan. He presented to Kramer a signed personal financial statement showing a net worth in excess of $700,000. As a result, a loan application was completed and a $15,000 loan made. The purpose of the loan as provided by Myers was listed in bank records as "Legal fees in connection with pending law suit against Rayram Corporation". It is clear that Kramer knew that this was not the purpose for which the loan was sought. The proceeds of the loan actually went to Adair in the form of a check payable to cash. Other evidence presented tended to prove that Myers' net worth was closer to zero than to $700,000.

Myers was charged with, and convicted of, three felony counts: (1) making a false statement on a bank loan application; (2) aiding and abetting Kramer in the misapplication of bank funds; and (3) aiding and abetting Kramer in making false entries in bank records.

Myers' appeal presents two grounds for reversal:

1. That he was denied the right of self-representation.

2. The verdict is not supported by the evidence.

■■■ The first of Myers' alleged errors hardly dignifies discussion. At his initial appearance before the Court he was represented by counsel but indicated a desire to represent himself. The Court directed that a formal written motion be presented. The case was set for trial. On the date of the trial appellant was again represented by the same counsel. Both counsel and Myers advised the Court that appellant did not want to press the request to appear pro se. Counsel proceeded throughout the trial to represent appellant. It is settled in this circuit that a defendant has a constitutionally guaranteed right to act pro se. *United States v. Pike*, 439 F.2d 695 (9th Cir. 1971). However, it is equally settled in this circuit that demand must be unequivocal. *Meeks v. Craven*, 482 F.2d 465 (9th Cir. 1973). Under the facts of this case, the request

was at best equivocal. Actually, we hold that the request was withdrawn and the right consciously and knowingly waived. No error is demonstrated.

Next, Myers attempts to demonstrate that the evidence presented by the Government was insufficient to support a judgment of conviction on Counts Twenty-two, Twenty-three and Twenty-four. In support of this contention, he presents arguments which indicate a failure to understand the thrust of the laws he is charged with violating.

■■■ As heretofore indicated, this appellant was charged in Count Twenty-two with making a false statement on a loan application to a federally-insured bank as interdicted by 18 U.S.C. § 1014. The gravity of this offense is the making of false statements calculated to *influence* the action of the bank. Myers posits that since the bank officer to whom the statement was tendered had determined in advance to authorize the loan, his false statement could not be said to have influenced the action of the bank. However, intriguing this argument may be, it has been and must be rejected as being a *non sequitur*. The phrase "for the purpose of influencing" is intended to define the quality of the requisite intent, not to immunize a defendant from criminal liability merely because the bank officer was a party to the scheme. *United States v. Fairbanks*, 541 F.2d 862 (10th Cir. 1976), *cert. denied*, 429 U.S. 1002, 97 S.Ct. 532, 50 L.Ed.2d 613 (1976); *United States v. Braverman*, 522 F.2d 218 (7th Cir. 1975), *cert. denied*, 423 U.S. 985, 96 S.Ct. 392, 46 L.Ed.2d 302 (1975); *United States v. Niro*, 338 F.2d 439 (2d Cir. 1964). The United States Supreme Court, while speaking in the context of a different statute, forty years' ago rejected the argument that proof that the lending agency was actually influenced was an essential ingredient of conviction for making a false statement with intent to influence. *Kay v. United States*, 303 U.S. 1, 58 S.Ct. 468, 82 L.Ed. 607 (1938).

■■■ From the language of 18 U.S.C. § 1014 and the teaching of the cases, we

hold that the essence of the offense in the making of the false statement with the intent to influence the lender is not dependent on the accomplishment of that purpose. It is a crime of subjective intent requiring neither reliance by the bank officers nor an actual defrauding. There was adequate evidence, which the jury evidently accepted, to support the verdict of guilt as to Count Twenty-two.

■ Appellant was charged as an aider and abettor to Kramer, the bank officer, in Count Twenty-three. In Count Twenty-three he was accused of violation of 18 U.S.C. § 656; § 2 in that he aided and abetted in the misapplication of bank funds (the $15,000 loan). The evidence supports a finding that Kramer delivered $15,000 of the bank's funds to appellant well knowing that the money was actually to be channeled to Adair. Kramer was able to so misapply the funds through the fiction of appellant's false application and statement of purpose. As we have heretofore pointed out in discussion of the Kennedy appeal, such a sham arrangement violates 18 U.S.C. § 656, as interpreted under *Hargreaves v. United States, supra.* The evidence amply supported the jury verdict on Count Twenty-three.

■ The indictment, in Count Twenty-four, charged Myers with aiding and abetting Kramer in making false entries on bank records, a violation of 18 U.S.C. § 1005; § 2. The false entry involved was a "loan application memorandum" which reflected the purpose of the loan. This document reflected that the purpose of the loan was for Myers to pay legal fees in connection with a pending law suit against Rayram Corporation. Appellant refers to evidence tending to show (a) that Kramer did not show Myers exactly what he wrote up in the loan application memorandum, and (b) that this particular record was intended only as a memo for use of the loan officer as a note of his interview with the borrower. Thus, it is argued that appellant did not know what was recorded and that anyway the memorandum did not constitute a bank "record".

From the evidence the jury could well have concluded that, since appellant told Kramer of the false reason for the loan, Kramer would utilize that reason in completing the loan records. As charged in Count Twenty-four, the evidence is sufficient to support a conviction for aiding and abetting in the making of a false entry in a bank record. Likewise, the evidence tends to show that the memorandum was one usually prepared by loan offices and retained in the loan file. There was sufficient evidence to sustain the jury verdict on Count Twenty-four.

No error being shown, judgment of conviction as to Robert J. Myers must be affirmed.

## APPEAL OF LAWRENCE F. CARLSON, No. 76–1880

As indicated above, Carlson apparently acted as an aide to one Robert Russell ("Russell") who was shown to have been closely associated with Adair and Kramer, yet was not indicted. He, Russell, described himself as "an insurance finder, insurance analyst or consultant". From the evidence it might be inferred that Russell masterminded the idea of procuring the Washington insurance company, General Security Life, but could not do so in his own name because of a prior felony conviction for fraud related to the insurance business. He apparently brought in Adair to front for the purchase.

Carlson was the only defendant charged with conspiracy along with Adair and Kramer, who were obviously the principal culprits. He was found guilty on the conspiracy count. He was charged with filing a false statement on a loan application submitted to Kramer and the jury was unable to arrive at a verdict on that count. He was charged with aiding and abetting Kramer in the misapplication of the funds of that loan and acquitted of that charge.

Carlson did not testify at the trial, but did give an oral interview to an investigator (Fuehrer). The investigator purported to relate the conversation. Both Adair and Russell testified on behalf of Carlson.

In seeking to overturn the conviction of conspiracy appellant raised several issues on this appeal.

1. It is claimed that the evidence is insufficient to prove that he willfully became a member of any conspiracy.
2. The contention is made that although only a single conspiracy was alleged, evidence was erroneously admitted showing multiple conspiracies.
3. Appellant urges that reversible error is revealed in the record in the admission of evidence.

Appellant concedes (1) that at least as to Adair and Kramer a conspiracy was proven; (2) that thereafter a conspirator committed one or more of the overt acts alleged; and (3) that such overt act or acts were done in furtherance of the conspiracy. He disputes that the evidence is sufficient to support a holding that he ever willfully became a member of that established conspiracy. The jury found otherwise, correctly, we believe.

■ There was competent evidence presented which tended to show the following set of facts:

That Carlson was a key actor in the entire attempt by Adair and others to secure control of General Security Life. He spent a great deal of time in the company of Adair and was frequently party to business conferences regarding the securing of funds to purchase control of the Washington insurance company. He knew that Adair and Kramer were acquaintances and that Adair conducted a series of borrowers to Kramer's bank to secure loans, the proceeds of which were transferred to Adair's use. A large portion of these funds were transferred into the bank account of Adair's wife and from that account by various, sometimes forged, checks redistributed into Carlson's account. The funds were then distributed by Carlson in an inexplicable pattern. At the request of Adair, Carlson went to Kramer and borrowed $25,000 which was thereafter used in a similar fashion to the proceeds from the other loans. There was evidence from which it might be concluded that Carlson followed the pattern of other borrowers and furnished a false financial statement to Kramer and supplied a fictitious contemplated purpose for the loan.

If the jury determined to give full credence to this circumstantial evidence and rejected other evidence tending to show lack of culpability, a reasonable inference might well follow that Carlson had indeed willfully joined the established conspiracy.

■ The weight to be given evidence and the reasonable inferences to be drawn therefrom is the prerogative of the jury. On appeal the evidence and proper inferences must be viewed in a light most favorable to the Government. *Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 86 L.Ed. 680 (1942). Likewise, we are mindful of the well-established rule of this circuit that once a conspiracy is shown to exist, only slight evidence is required to connect a defendant with the conspiracy. *United States v. Westover*, 511 F.2d 1154 (9th Cir. 1975), *cert. denied*, 422 U.S. 1009, 95 S.Ct. 2633, 45 L.Ed.2d 673 (1975).

Based on our review of the record before us, we are constrained to hold that there was a sufficient basis in the evidence to support the jury verdict finding the defendant guilty of violation of the conspiracy charge.

Next, appellant claims he was prejudiced by proof of multiple conspiracies admitted, though only a single conspiracy was charged. Carlson relies on the holding in *Kotteakos v. United States*, 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946). *Kotteakos* holds that where there is a variance between the charge of a single conspiracy and proof of multiple conspiracies, the likelihood of prejudice to the accused is great. It is clear, however, that *Kotteakos* can only be helpful to appellant if the record sustains the contention that proof of multiple conspiracies was indeed admitted. *Blumenthal v. United States*, 332 U.S. 539, 68 S.Ct. 248, 92 L.Ed. 154 (1947).

■ Evidence was admitted concerning the activities of Adair, Russell, Carlson, and others to purchase control of General Securities Life. This evidence made up an integral part of the proof of the conspiracy as

an alleged purpose of the conspiracy was to acquire financing unlawfully in order to lawfully obtain the insurance company. No separate conspiracy was alleged, claimed, or proved. So that the jury would not be confused on this question, the trial judge specifically advised the jury as follows:

"Additionally reference has been made to the program for acquiring insurance companies in the State of Washington.

"The government has not asserted that there was any improper conduct in this series of transactions. You are not to assume any improper conduct occurred in connection with these transactions."

No prejudice to appellant is demonstrated as to this evidence.

 During the cross-examination of co-indictee, Adair, and Carlson's associate, Russell, called as defense witness, the Government was allowed to inquire into other transactions in which Carlson and the witnesses were involved. We have reviewed this evidence and find that it did not constitute an attempt to show other conspiracies. Nor did the fact that some of the transactions occurred prior to and some antedated the period of the charged conspiracy make them inadmissible. We are satisfied that the evidence had probative value. Further, much of the evidence was admissible as impeachment of the witnesses.

Once again the judge in his instructions cautioned the jury that these collateral transactions were not claimed to be a part of the charged wrongful conduct. There was no error in admitting the evidence elicited on cross-examination.

 Lastly, Carlson objects to the introduction of his 1972 and 1973 federal income tax returns. Suffice to say, the returns tended to prove that entries in the financial statement submitted to the bank to support Carlson's loan were false or misleading. Since he was specifically charged in Count Seventeen (false statements on a loan application), it follows that these returns were properly received in evidence.

The judgment appealed from in the appeal of J. Joseph Kennedy, No. 76–1333, is affirmed.

The judgment appealed from in the appeal of Robert J. Myers, No. 76–1238, is affirmed.

The judgment appealed from in the appeal of Lawrence F. Carlson, No. 76–1880, is affirmed.