UNITED STATES of America,
Plaintiff-Appellee,

v.

Carol G. UNRUH, William L. Fowler,
Robert Hopper, Stephen C. Forde,
Defendants-Appellants.

Nos. 84–5211 to 84–5213 and 84–5234.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted March 7, 1986.

Decided Sept. 3, 1987.

As Amended on Denial of Rehearing
Aug. 16, 1988.

Eve Bermingham, San Diego, Cal., for plaintiff-appellee.

Peter H.A. Wodinsky and James Duff, Los Angeles, Cal., H. Dean Steward, Honolulu, Hawaii, Barton Sheela, III, San Diego, Cal., Paul D. Wolf, Oakland, Cal., and Geoffrey Greenup, Sherman Oaks, Cal., for defendants-appellants.

Before GOODWIN, WALLACE and KOZINSKI, Circuit Judges.

GOODWIN, Circuit Judge:

Stephen C. Forde and three of his associates in a bank fraud scheme appeal their respective convictions following a jury trial on various counts of a 72–count indictment.

Jon W. Schroeder, Edward Hart, Carol G. Unruh, William L. Fowler, and Robert Hopper were charged with Forde. The indictment charged one count of conspiracy, 18 U.S.C. § 371 (1982); 61 counts of misapplication of bank funds, 18 U.S.C. § 656 (1982), including a check-kiting scheme and 60 misapplied loans; three counts of false entries in bank records, 18 U.S.C. § 1005 (1982); seven counts of mail fraud, 18 U.S. C. § 1341 (1982); and numerous instances of aiding and abetting the commission of these crimes, 18 U.S.C. § 2 (1982).

Schroeder and Hart pleaded guilty, and the remaining defendants were tried together. Forde was found guilty of 35 counts of misapplication of bank funds and three counts of making false entries, sentenced to 15 years in custody, and ordered to pay nearly $3 million in restitution. Fowler was found guilty of six counts of misapplication and sentenced to five years, and to make restitution of $175,000; Unruh, two counts of misapplication, 30 months, $75,000; and Hopper, one count of misapplication, two years, no restitution.

The evidence presented at trial, viewed in the light most favorable to the prosecution, revealed that:

In 1981, Forde, a lawyer who controlled the Bank of San Marino (BSM), was financially overextended. In December 1981, he, Schroeder and two associates took control of Pacific Coast Bank (PCB). Between December 1981 and March 1982 Forde engaged in a check-kiting scheme and caused PCB to make numerous questionable loans. Many of the loans were for amounts at or near PCB's lending limit and were made to persons who would not ordinarily qualify for such loans under prudent banking practices. A substantial portion of the proceeds of these loans benefited Forde and Schroeder.

Unruh was a law student. During this period she prepared for the bar examination and managed Forde's checking accounts. Fowler was an experienced loan broker. Hopper had experience in the banking business. Fowler and Hopper assisted Forde by soliciting individuals to obtain loans at PCB in order to invest in business ventures benefiting Forde and Schroeder.

Count one of the indictment charged the defendants with conspiring to commit the charged substantive crimes. This count was later dismissed on the government's motion.

Count two charged Forde and Unruh with kiting checks. Forde had checking accounts at a number of banks, including PCB and BSM. Each of these banks, as a matter of policy, would notify Forde of potential overdrafts and allow him to deposit a check to cover the deficiency. Forde would then write a check on another one of his accounts and deposit it to the deficient account. Because each new check would be credited to the deficient account before it would be charged to its own account, Forde could generate the appearance of a positive net balance in his accounts. Generally, the account on which his covering check was written would be without sufficient funds to pay the covering check. When the drawee bank for the covering check notified Forde of the deficiency, he would deposit an unfunded check from another account in which he had overdraft privileges but insufficient funds to cover the check. As a result of this scheme, Forde made temporary use of substantial amounts of bank funds. Unruh wrote most of these checks. Forde and Unruh were convicted on this count.

Counts three to eleven concern loans from PCB to various individuals, including Unruh (count seven), Hopper (count eight), and Fowler (count eleven). The prosecution argues that much of the loan proceeds

was diverted to Forde and his associates. Forde was convicted on all but count eight. Unruh was convicted on count seven, and Hopper was convicted on count eight. The jury was unable to agree on Fowler's counts.

Counts 12 to 19 address eight loans, each for $75,000. In each case the borrower agreed to re-lend $35,000 to Charter Services Corporation, a shell corporation owned by Forde and Schroeder. Fowler solicited these borrowers and ran the Charter checking account that funneled funds to Forde and Schroeder. Counts 12 and 15 were withdrawn before deliberation. Fowler and Forde were convicted on the other counts in this group.

Counts 20 to 28 involve loans used to purchase stock of the Aloha National Bank, which Forde had founded. The loans were designed to help Forde gain control of the bank. The prosecution withdrew counts 21 to 23 and 25 to 26. The jury hung on the other counts. These counts will not be further considered.

Counts 29 to 62 concern transactions the parties refer to as "the partnership loans." Forde planned to raise money by selling some of his real estate. Fowler and Hopper solicited persons with clearly inadequate credit ratings to obtain loans from PCB and use the loan proceeds to become limited partners in one of a number of limited partnerships Forde established, and in which he served as general partner. Forde would then sell to the new partnership at an inflated price property he owned or controlled. All of the counts charged Forde and Unruh, and some of them charged the other defendants. The prosecution withdrew counts 30 to 35, 51, 54 to 55, and 61 to 62. The jury convicted Forde on counts 29, 36–39, 43–50, 52 to 53, and 56 to 60. The jury hung on the remaining charges.

Counts 63 to 65 charge Forde with making false entries in PCB's records. He was convicted on these counts.

Counts 66 to 72 charge all four defendants with participating in a scheme to deceive those who had previously invested in their investment schemes by leading them to believe that their investments were sound. Counts 67 and 70 were withdrawn; the jury hung on the remaining counts.

### Sufficiency of the Evidence of Check-Kiting

Forde and Unruh challenge the sufficiency of the evidence to sustain their convictions of violating 18 U.S.C. § 656 (1982) by kiting checks. Section 656 is violated if (1) the defendant was an executive officer of a bank, (2) which was connected in some capacity with the Federal Reserve System, who (3) willfully misapplied the funds of that bank and (4) acted with intent to injure and defraud that bank. *See United States v. Christo*, 614 F.2d 486, 490 (5th Cir.1980).

Like many banks, the Pacific Coast Bank and the Bank of San Marino, both of which Forde controlled, tried to avoid dishonoring checks written by their officers and certain valued depositors. *See Christo*, 614 F.2d at 493 (noting that the honoring of insider overdrafts is a general practice in the banking industry). If a check written by Forde on his PCB account was presented to that bank for payment at a time when that account did not contain sufficient funds to cover the check, the bank would inform Forde or Unruh and allow one of them to deposit a check on its face sufficient to cover the shortfall.

Forde argues that he was taking legitimate advantage of an open and accepted policy. If the bank's practice of honoring insider overdrafts was a service it provided, in the exercise of its business judgment, as an accommodation to its officers and special customers, it was supplemental compensation to the officers. And, Forde argues, even if his extensive use of the "no-bounce" policy exceeded the bank's consent, and so injured the bank, he did not violate § 656 because he did not intend to harm or defraud the bank. In support of this argument, Forde points out that he did not attempt to conceal his activities from the banks involved. He controlled both banks.

The prosecution contends that Forde and Unruh's pattern of activities was proof of

criminal intent. On 39 of the 56 days analyzed, the effective net balance in Forde's various checking accounts was negative, in an amount averaging $64,000. Forde was thus able to use for his own purposes an average of $64,000 of a bank's money without having to apply for a loan, provide security, or pay interest. Forde says this is a fringe benefit of owning a bank and therefore its enjoyment is not a felony.

Forde relies on *Christo*, which reversed a conviction for violating § 656 and stated, "[T]he prosecution does not cite, nor is this Court aware of, even one case upholding a conviction for willful misapplication involving unconcealed checking account overdrafting by a bank officer or employee.... [A] case of insider overdrafting has never been held to constitute willful misapplication." 614 F.2d at 493. In most convictions under § 656 for check-kiting, the defendants either departed from the bank's normal procedures or attempted to conceal their activities from other bank employees. *See, e.g., United States v. Landof*, 591 F.2d 36 (9th Cir.1978) (cashier's checks issued based on insufficiently funded checks); *Benchwick v. United States*, 297 F.2d 330 (9th Cir.1961) (checks kept in deferred items account to avoid creating overdrafts).

*Christo* is weak and ambiguous support for Forde's position. Christo, unlike Forde, was a bank officer taking unconcealed advantage of his bank's policy of honoring insider overdrafts. But Christo's conviction was reversed because the judge instructed the jury that a § 656 violation could be predicated on a violation of a civil banking regulation. No such error was committed here. Moreover, *Christo* was remanded for trial on the theory that the facts "might have been sufficient" to find criminal misapplication. 614 F.2d at 494–95. The court said that willful misapplication with intent to injure and defraud would require case-by-case examination.

The prosecution relies on cases showing that the board of directors of a bank does not have the authority to condone such uncontrolled extensions of credit. *See United States v. Beran*, 546 F.2d 1316, 1321 (8th Cir.1976), *cert. denied*, 430 U.S. 916, 97 S.Ct. 1330, 51 L.Ed.2d 595 (1977); *United States v. Salinas*, 654 F.2d 319, 328 & n. 12 (5th Cir.1981), *overruled in part on other grounds, United States v. Adamson*, 700 F.2d 953, 965 n. 18 (5th Cir.) (en banc), *cert. denied*, 464 U.S. 833, 104 S.Ct. 116, 78 L.Ed.2d 116 (1983). *Cf. United States v. Gregory*, 730 F.2d 692, 701–02 (11th Cir.1984) (board consent is particularly suspect when the board was controlled by defendants), *cert. denied*, 469 U.S. 1208, 105 S.Ct. 1170, 84 L.Ed.2d 321 (1985).

However, the prosecution's cases are also ambiguous. For example, *Beran* held:

> The valid consent of the board of directors is a defense to the crime of misapplication of bank funds.... The board, however, has no authority to approve of a crime or fraud on the bank.... Thus, if an intent to defraud through the conversion of bank funds existed, then approval of the board of directors is no longer material to whether there was a misapplication of bank funds.

546 F.2d at 1321. This language is ambiguous because intent to injure or defraud the bank is an essential element of misapplication under section 656. *United States v. Arthur*, 544 F.2d 730, 736 (4th Cir.1976). *Salinas* and *Gregory* follow *Beran*. The *Beran* case does not define valid consent. Nor does it define what crimes are beyond the reach of consent. If valid consent were a complete defense to a § 656 violation, the board would have the power to sanitize conduct that otherwise would be a crime. The cases can not be presumed to have created a license to steal. The better reasoning treats board consent as evidentiary. "[The board's] knowledge, ratification, and consent are not *per se* defenses to the charge. Instead these are evidentiary matters that may be considered as part of the defense that there was either no willful misapplication or no intent to injure the bank." *United States v. Cauble*, 706 F.2d 1322, 1353 (5th Cir.1983) (footnote omitted), *cert. denied*, 465 U.S. 1005, 104 S.Ct. 996, 79 L.Ed.2d 229 (1984). *Cauble* also notes " '[r]eview by the board is a particularly dubious basis for exculpating the [defendant] in this case, since the evidence showed

that [the defendant] was the moving force behind the board of directors.'" *Id.* at 1354 n. 125, *quoting Salinas,* 654 F.2d at 328 n. 12.

We decline to interpret "valid" consent as merely requiring the observance by those in control of the bank of corporate formalities. Proscriptions of misconduct by bank officers, directors, agents, or employees suggests that § 656 was directed against insiders, who would ordinarily be in a position to observe corporate forms. Defining valid consent to require merely the observance of corporate form would be inconsistent with the purpose of § 656. The parties had the right to argue whether the consent was the result of manipulation or is otherwise invalid. The jury could have decided that the apparent consent of the board might negate the intent element of misapplication.

◼ The evidence here also could justify the jury's conclusion that Forde misapplied bank funds. Forde held a controlling block of stock in the PCB and BSM. This control could justify the conclusion that the respective bank boards were not exercising independent judgment but were acting as tools of Forde. While banks are entitled to spend money on salaries and bonuses, the jury could have found that a disinterested board would not have approved an open-ended authorization to use the bank's credit for Forde's personal purposes. *Cf.* H. Henn & J. Alexander, *Laws of Corporations* § 245 at 670–71 (3d ed. 1983) (special scrutiny for insider compensation). Under these circumstances, the jury could find that consent by the board was not valid and therefore not a defense. The jury could also find that Forde had no intent to injure the bank.

While the jurors had sufficient evidence to conclude that Forde knew that the board was not exercising its independent judgment, there was also some evidence that the board did act independently. A director of Forde's banks testified that Forde picked Hart as president for bank because Hart was controllable, albeit stupid. The director also testified that at a directors meeting, the independent directors had been shocked by Forde's overdrafting. Finally, Forde had notice that overdrafts were subject to Regulation O, 12 C.F.R. pt. 215 (1986), which prohibits bank loans to insiders exceeding $25,000 without special procedures, and that his overdrafts violated the regulation. Under these circumstances, the jury could conclude that despite Forde's disclosure of his conduct to directors, Forde's intent was to misapply bank funds and that his interest-free loans were not a part of Forde's authorized compensation. The kiting count against Forde had an evidentiary basis to go to the jury.

Unruh argues that her preoccupation with her studies meant that she could not have had any criminal knowledge or intent. She relies on *Snyder v. United States,* 448 F.2d 716 (8th Cir.1971). The defendants there relied on a bank president as their financial adviser, and were themselves so naive in financial matters that they did not pay attention to the transactions the president conducted on their behalf. Unruh, by contrast, was a trained if not admitted lawyer. She personally managed Forde's checking accounts, communicated with a number of banks on a daily basis, and caused checks to be delivered by messenger to cover any shortfalls. It defies common sense to say that she knew nothing of the check-kiting scheme.

◼ Unlike in Forde's case, however, the instructions did not require the government to prove that Unruh had notice that the transactions violated bank rules. The directors testified that she was not present at any of the board meetings. Fowler also was not present. Unlike Forde, Unruh had no specific reason to know of Regulation O. She received no special financial benefit from the check-kiting. She did know that the banks had a policy of covering the overdrafts of some customers and directors and officers, that Forde had fully informed the banks of his actions, and that the directors allowed the practice to continue for some months. She knew of Forde's apparent wealth. Under these circumstances, an inference that Unruh knew that the board's consent was invalid would have to be supported by evidence weighed under an ap-

propriate instruction. The jury may have found Unruh guilty because it was not instructed that the consent of the board and the good-faith belief that the board had consented were defenses to her criminal intent in participating in the scheme. Consequently, Unruh's conviction on count two must be vacated and remanded for another trial with a proper instruction on the good-faith defense.

## The Loan to Acquire Land for the Bank

Forde and Unruh were convicted under count seven, which charged them with misapplying bank funds by borrowing $75,000 from PCB with the knowledge that a substantial portion of the loan proceeds would be used by Forde for his personal benefit.

The Forde group, which controlled PCB, wanted to purchase a parcel of land on Balboa Island, with a view toward opening a "minibank" branch there. Forde did not want the seller to know the identity of the buyer because the seller might then have held out for a higher price. Forde asked Unruh to serve as a nominee buyer, as an accommodation to Forde and the bank. So far, nothing illegal is suggested. The bank's board of directors knew and approved of this arrangement.

In October 1981, Unruh opened the escrow, and Forde deposited $10,000 of his funds. Unruh borrowed $75,000 from PCB in December 1981. From the proceeds of that loan, Unruh transferred $47,000 to Forde, $10,000 to reimburse his initial escrow deposit, and $37,000 later to Forde because he needed it temporarily for other purposes. Forde eventually deposited an equivalent amount in the escrow. Unruh placed the balance of the loan proceeds in the escrow. The entire amount of the loan thus was used to purchase the Balboa Island property, even though portions of the loan had been transferred temporarily to Forde. The Balboa Island purchase was completed, and Unruh's loan was later repaid to PCB by Forde.

The prosecution argues that this transaction was criminal because the purchase of the Balboa Island property was a first step in Forde's long-range scheme to sell the property at an inflated price to the bank. Unruh took the title as nominee for the bank. While a re-transfer to the bank at a higher price would have been highly unlikely, the government claims that is what Forde eventually attempted. The government's brief cites no page reference in the 25 volumes of the transcript to support this assertion, so we must treat it as unsupported by evidence.

■ The prosecution also argues that the transaction was criminal because Unruh knowingly allowed Forde temporarily to use a substantial portion of loan proceeds for personal purposes unrelated to the Balboa Island purchase. However, the temporary diversion was not shown to be contrary to the purposes for the loan stated in the loan application. Unlike some other loans, this one provided no apparent kickback to Forde. Forde provided his own credit, and Unruh gave the bank a security interest in the property and obtained no personal benefit by serving as nominee. The prosecution points to the favorable loan arrangements as signs of the illegitimacy of the loan. The loan may have been substandard, but Unruh was a nominee for the bank, and the jury could believe that the loan was a paper transaction for the benefit of the bank. The bank had no interest in charging itself loan fees. The evidence on this count was insufficient to support a conviction of crime. Neither Unruh nor Forde was proven to have misapplied bank money with criminal intent on count seven. Each conviction on count seven is reversed.

## Hopper's Aiding and Abetting Conviction

Hopper contends that there was insufficient evidence to sustain his conviction for aiding and abetting Forde's misapplication of the $75,000 loan from PCB to Hopper because that loan also was repaid in full in the following month, with interest, and was made at the instigation of Hart, the bank president, with the consent of the executive loan committee members.

■ Aiding and abetting a misapplication of bank funds occurs when a bank employee misapplies bank funds and the defendant knows of the bank employee's substantive offense and acts with intent to further it. *United States v. Anderson,* 709 F.2d 563, 563 (9th Cir.1983).

FDIC examiner Johnson testified that because the only document in the bank's loan file was a disbursement form, there was insufficient information on which to make a credit decision to loan Hopper $75,000. Hopper's net worth was then only $38,000. There was no promissory note for the loan in the loan file. PCB did not earn a loan fee for Hopper's loan. Hopper first deposited the loan proceeds into the PCB account. Hopper immediately wrote a check to Hart for the entire $75,000. Hart endorsed it and deposited it into the Charter Services Corporation account. The money then went to Campus Dental Plan, Schroeder, and to various Forde bank accounts.

■ Hopper argues that because the loan was repaid in full with interest, he committed no misapplication. However, misapplication "occurs when funds are distributed under a record which misrepresents the true state of the record with the intent that bank officials, bank examiners, or the FDIC will be deceived." *United States v. Kennedy,* 564 F.2d 1329, 1339 (9th Cir.1977), *cert. denied,* 435 U.S. 944, 98 S.Ct. 1526, 55 L.Ed.2d 541 (1978). Thus, while repayment is relevant to the intent with which a loan is made, it is not by itself a complete defense. The jury might legitimately consider that the loan was repaid with money Forde gave Hopper on the day after the FDIC began examining PCB. This count differs from Count 7 in that in Count 7 no bank records were falsified.

The transfer of funds to Hart permitted the inference that Hopper acted as a sham borrower for Hart, which would be a misapplication of bank funds by a bank employee. There is also sufficient evidence to find that Hopper intended to aid and abet the misapplication. Hopper accepted the loan in his name, but signed the proceeds over to Hart. Hopper's report, identifying management and operational problems at PCB before its purchase by Forde, cited problems with PCB's loan procedures, including improper processing and monitoring of loans and deficient loan applications. Hopper was aware of proper loan procedures, but used procedures that did not allow the bank to assess his creditworthiness or explain to the FDIC how the loan would be used, secured, or repaid. *See Kennedy,* 564 F.2d at 1341; *Anderson,* 709 F.2d at 564.

Forde testified that Schroeder told him that Hart had created an accounting problem for the bank and that a $75,000 loan to Forde and a $50,000 loan to Hart would solve the problem. Forde did not wish to take out a loan, however, and asked Hopper to investigate. Forde testified that he later learned that Hopper had been talked into taking the $75,000 loan. However, the jury was free to disbelieve Forde.

Hopper also argues that a bank officer does not misapply bank funds by using a third party to borrow money that is then re-lent to the officer. He relies on *United States v. Gens,* 493 F.2d 216, 223 (1st Cir. 1974), and *United States v. Docherty,* 468 F.2d 989, 995 (2d Cir.1972). Both cases limit this holding to situations where the borrower is financially able to repay the loan and understands that he is responsible for repayment. Here, evidence suggested that Hopper was not financially able to repay the loan. Moreover, this circuit has explicitly rejected *Docherty* and *Gens* on this issue. *See Kennedy,* 564 F.2d at 1339.

We recently ruled in *United States v. Stozek,* 783 F.2d 891, 893 (9th Cir.1986), *cert. denied,* 479 U.S. 888, 107 S.Ct. 284, 93 L.Ed.2d 259 (1987), that the requisite intent to injure or defraud a bank "may be inferred from defendant's reckless disregard." Applying this principle to our case, the record shows that Hooper, at the very least, acted recklessly. In a preliminary report prepared for the defendant Forde on the condition of the Pacific Bank, Hopper specifically criticized the bank's practice of loaning large sums of money to individuals with inadequate assets. Hopper's own net worth would not qualify the loan. Furthermore, in the same report,

Hopper went on at length about how the bank's reputation had been injured by various banking practices.

Finally, Hopper argues that the bank's board of directors or its executive loan committee consented to the use of its funds. However, the jury could have concluded that the board was controlled by the conspirators, that its consent was not given in good faith, and that Hopper knew this.

■ There was ample evidence for a properly instructed jury to convict Hopper.

### Failure to Instruct on Board Consent

The defendants argue that the district court erroneously failed to instruct the jury on the defense of consent by the bank's board of directors.[1] They rely on Forde's proposed jury instructions B and C, which were joined in by all the defendants. The pertinent portions follow.

> In deciding whether any particular loan constitutes a misapplication, you must consider whether the loan was approved by or disclosed to the board of directors or any group to which the board delegated loan authority. Disclosure of pertinent facts concerning a loan to those in control of the bank may indicate that the bank was not deprived of the right to make its own decisions as to how the funds would be used.

> In determining whether any defendant harbored an intent to defraud with respect to each particular loan, you should consider whether the relevant facts regarding the loan were disclosed to the Board of Directors of the bank or to any group to which the board delegated loan authority.

For the reasons stated in the discussion of the sufficiency of the evidence on misapplication of bank funds, Forde was entitled to an instruction correctly stating the law on the effect of valid board consent to the check kiting. The trial judge did not give an instruction on board consent to check kiting.

Unruh's and Forde's convictions on count seven must be reversed as noted earlier, because of the insufficiency of the evidence. Forde's conviction for misapplication through kiting checks was based on evidence from which the jury could easily have drawn conflicting inferences. We must remand both Forde's and Unruh's count two convictions because of the failure to give the requested instruction. Forde's convictions for making false entries are obviously unaffected by any error in the misapplication instruction. These convictions are affirmed.

■ For the other counts, the failure to give a requested instruction is reversible error if the defendant's theory of the case is supported by law and has some foundation in the evidence. *See United States v. Makhlouta,* 790 F.2d 1400 (9th Cir.1986); *United States v. Echeverry,* 759 F.2d 1451, 1455 (9th Cir.1985). We cannot affirm the conviction even if convinced beyond a reasonable doubt that the error was harmless. "If the sixth amendment right to have a jury decide guilt and innocence means anything ..., it means that the facts essential to conviction must be proven beyond the jury's reasonable doubt, not beyond ours." *United States v. Voss,* 787 F.2d 393, 398 (8th Cir.1986).

■ Forde's theory of the case on the partnership loans was that Hart and Schroeder were the guilty parties and that they, as members of the executive loan committee, tacitly approved the loans. Forde introduced enough evidence to support his argument to justify a jury instruction on his theory. His convictions for misapplying bank funds in connection with the partnership loans must be remanded.

Hopper defended on the ground of consent. Forde testified that Schroeder called him and informed him of an accounting problem at the bank, and asked Forde and Hart to borrow money to resolve the problem. Forde asked Hopper to investigate.

---

**1.** Forde and Hopper raise the issue explicitly. In *United States v. Wingender,* 790 F.2d 802 (9th Cir.1986), we considered a meritorious argument originally made only by a codefendant on a petition for rehearing. No purpose would be served by making Fowler and Unruh file a petition after our decision.

Hopper took out the loan. Because Schroeder, Hart, and Forde constituted the executive loan committee, the jury could have acquitted Hopper based on the apparent consent. Hopper's conviction must be remanded for failure to instruct on consent.

Fowler defended on the ground that he was following the legitimate instructions of his codefendants. This made the issue of Fowler's good-faith critical. His convictions must also be remanded for failure to instruct on his defense of good faith.

### Intent to Injure or Defraud

Hopper also contends that the trial court improperly instructed the jury on intent to injure or defraud. The challenged instruction reads:

> An intent to injure or defraud a bank exists if a person acts knowingly, and if the natural result of his conduct would be to injure or defraud the bank, even though this may not have been his motive.

Two courts have disapproved a substantially identical instruction, although neither court actually held that giving the instruction constituted reversible error. *United States v. Arthur*, 544 F.2d 730, 736–37 (4th Cir.1976), warned the district court that the instruction was erroneous, but reversed on other grounds. *United States v. Cooper*, 577 F.2d 1079, 1082–83 (6th Cir.), *cert. denied*, 439 U.S. 868, 99 S.Ct. 196, 58 L.Ed.2d 179 (1978), found the instruction misleading, but concluded that in the context of the rest of the instructions and the evidence in that case, it was not so prejudicial as to require reversal.

■ *Arthur* and *Cooper* correctly question the instruction. If a jury finds that the natural consequences of a defendant's conduct are to injure the bank, it should be permitted to infer that he intended those consequences, but the challenged instruction could easily be interpreted by a reasonable juror to compel that inference. *See Sandstrom v. Montana*, 442 U.S. 510, 99 S.Ct. 2450, 61 L.Ed.2d 39 (1979). On retrial the instruction should be modified to avoid another round of appeals.

### Jury Instruction on Reasonable Expectation

■ A person is not guilty of kiting checks if he reasonably expects that funds sufficient to cover the check will be deposited by the time it is presented to the payor bank for payment. *Williams v. United States*, 278 F.2d 535, 537 (9th Cir.1960). The trial court agreed to give an instruction based on *Williams*, but amended that instruction by requiring that the covering deposits be "good funds." Unruh and Forde argue that requiring that the covering funds be "good funds" unfairly prejudiced them. This is nonsense.

■ There was extensive testimony at the trial concerning the check-kiting scheme. Unruh and Forde cite only the prosecutor's closing argument to support their argument that the requirement of "good funds" precluded the reasonable expectation defense. The prosecutor then characterized the loan proceeds as "good funds": "When did good funds come into the account? The loans. The loans. Two million dollars' worth of loans. Those were when the good funds came into the account." The defendants argue that the prosecutor rescinded that characterization in the next sentence: "That's, in itself, a misapplication right there...." The prosecutor's main point is clear. The overwhelming thrust of the testimony was that "good funds" meant "collectible funds," irrespective of the legality of the activity responsible for those funds. Some witnesses expressly defined "good funds" or "good money" in terms of collectibility. The clear implication from prosecution witness Miller's explanation of the check-kiting scheme was that once partnership loan proceeds had been deposited in Forde's accounts in an amount sufficient to cover checks presented for payment, there was no kiting violation. The amended instruction could not have misled the jury.

### Motions for Severance by Fowler and Hopper

Fowler and Hopper contend that the trial court abused its discretion by denying their

pretrial motions for severance. Where the joinder of parties is proper, we review a denial of a motion for severance under Fed.R.Crim.P. 14 only for abuse of discretion. The factors to be weighed in deciding whether to sever include judicial economy and prejudice. *United States v. Kennedy,* 564 F.2d 1329, 1334 (9th Cir.1977), *cert. denied,* 435 U.S. 944, 98 S.Ct. 1526, 55 L.Ed.2d 541 (1978). The defendant must show clear, manifest, or undue prejudice from a joint trial and a violation of a substantive right. *United States v. Escalante,* 637 F.2d 1197, 1201 (9th Cir.), *cert. denied,* 449 U.S. 856, 101 S.Ct. 154, 66 L.Ed.2d 71 (1980).

The court's prejudice inquiry focuses on "whether the jury can reasonably be expected to compartmentalize the evidence as it relates to separate defendants in light of its volume and limited admissibility." *United States v. Ramirez,* 710 F.2d 535, 546 (9th Cir.1983) (quoting *United States v. Brady,* 579 F.2d 1121, 1128 (9th Cir.1978), *cert. denied,* 439 U.S. 1074, 99 S.Ct. 849, 59 L.Ed.2d 41 (1979)).

■ The best evidence of the jury's ability to compartmentalize the evidence is its failure to convict all defendants on all counts. *See United States v. Kaplan,* 554 F.2d 958, 967 (9th Cir.) (per curiam), *cert. denied,* 434 U.S. 956, 98 S.Ct. 483, 54 L.Ed.2d 315 (1977). That the jury was unable to agree on a count rather than acquit does not undermine this principle. *See Kennedy,* 564 F.2d at 1334–35. The verdict here suggests that the jury did not indiscriminately convict, but separated the evidence as to each defendant. *Id.* While the convictions on counts for which the evidence was insufficient might suggest that the jurors were prejudiced or confused, those convictions can be explained by the factors other than failure to grant separate trials. As the trial judge noted, the lengthy deliberation was at least as consistent with careful and thorough deliberation as with confusion and prejudice. Fowler and Hopper have shown no error in the refusal to sever.

## Fowler's Motion To Dismiss

As part of the government's investigation in parallel civil proceedings, Fowler was deposed by the Comptroller of Currency. Fowler asserts that the testimony he gave during this deposition prejudiced his criminal defense, so that the district court should have dismissed his indictment.

■ The prosecution may use evidence obtained in a civil proceeding in a subsequent criminal action unless the defendant shows that to do so would violate his constitutional rights or depart from the proper administration of criminal justice. *United States v. Kordel,* 397 U.S. 1, 12–13, 90 S.Ct. 763, 769–70, 25 L.Ed.2d 1 (1970).

■ Although Fowler was not accompanied by counsel at the deposition, he appeared and testified on advice of counsel. At the deposition he was advised of his rights to have counsel present, to leave at any time, and to refuse to answer any questions or give any evidence that might incriminate him, and he was warned that his statements could be used against him in a criminal proceeding. The defendant's failure to invoke the privilege against self-incrimination waives a later claim of privilege. *See Minnesota v. Murphy,* 465 U.S. 420, 427, 104 S.Ct. 1136, 1142, 79 L.Ed.2d 409 (1983).

There was no evidence of bad faith on the part of the prosecution in bringing the civil proceeding. The civil investigation culminated in at least one civil suit on behalf of the United States. The deposition took place more than 14 months before Fowler was indicted.

The district court did not err in denying Fowler's motion to dismiss the indictment. *See United States v. Jenkins,* 785 F.2d 1387, 1392–93 (9th Cir.1986).

## Admission of Co-Conspirators' Statements

To prove misapplication of bank funds, the prosecution presented the testimony of numerous individuals who borrowed money from PCB to invest in a limited partnership, Aloha National Bank, or partially in Charter Services Corporation and partially

in an independent venture. The borrowers testified that Fowler and Hopper had induced them to take advantage of the PCB loan and investment opportunities by stressing Forde's authority and willingness to approve transactions as well as his guarantee that the borrowers would encounter no financial risk.

Over Forde's objection, the district court admitted the out-of-court statements by Fowler and Hopper as co-conspirators' statements under Fed.R.Evid. 801(d)(2)(E). These statements were to the effect that

Forde was a successful businessman. He was a multimillionaire. He was an attorney. He owned the Pacific Coast Bank; and he was involved with two other banks in Southern California; he had bought an unsuccessful bank and made it very successful.

Forde contends that the district court denied his sixth amendment right to confront Fowler and Hopper by admitting these statements.

However, it is now established "that the requirements for admission under Rule 801(d)(2)(E) are identical to the requirements of the Confrontation Clause." *Bourjaily v. United States*, — U.S. —, 107 S.Ct. 2775, 2782, 97 L.Ed.2d 144 (1987); *see United States v. Paris*, 827 F.2d 395, 400–01 (9th Cir.1987). Therefore, the confrontation clause no longer is deemed to require an independent inquiry into the reliability of the statements of co-conspirators. *See Bourjaily*, 107 S.Ct. at 2782–83; *Paris*, at 400. Forde's confrontation clause claim thus lacks merit.

We conclude that the statements were corroborated. While Forde may have wanted to examine Fowler's and Hopper's motives, their motives could not have affected the truthfulness of the statements. There was no violation of the confrontation clause.

### Admission of Bank Examiner's Testimony

Forde argues that the district court abused its discretion by admitting the expert testimony of FDIC bank examiner Bruce Johnson because the testimony amounted to a "republication" of Johnson's FDIC report, which was barred from admission at trial as hearsay. Forde contends that Johnson's testimony based on the inadmissible FDIC report violated his confrontation rights. Forde also objects to Johnson's testimony concerning the creditworthiness of the borrowers, the repayment of loans, and Regulation O, 12 C.F.R. Pt. 215 (1986).

### A. Relevance

The creditworthiness of the borrowers is relevant because a bank officer who, with intent to defraud or injure, makes loans to "financially incapable" individuals is guilty of misapplication of bank funds. *See United States v. Blackwood*, 735 F.2d 142, 145 (4th Cir.1984); *United States v. Gens*, 493 F.2d 216, 222 n. 12 (1st Cir.1974). Evidence about repayment was relevant to the initial creditworthiness of the borrowers. *See United States v. Duncan*, 598 F.2d 839, 858 (4th Cir.), *cert. denied*, 444 U.S. 871, 100 S.Ct. 148, 62 L.Ed. 2d 96 (1979). The testimony about Regulation O, which required board approval for any PCB loan in excess of $25,000 to Forde, *see* 12 C.F.R. § 215(b)(1) (1986), tended to show Forde's motive for funneling loans to himself through other borrowers.

### B. Hearsay and Denial of Confrontation

Johnson supervised the 1982 FDIC examination of PCB. He supervised the preparation of a report on the bank, but did not personally review all the loan files discussed in the report. The district court ruled that the FDIC report would be inadmissible under Fed.R.Evid. 803(8)(C), the exception for public records and reports, because the report was prepared in the context of litigation. The prosecution does not contest this ruling. *See United States v. Hernandez-Rojas*, 617 F.2d 533, 535 (9th Cir.), *cert. denied*, 449 U.S. 864, 101 S.Ct. 170, 66 L.Ed.2d 81 (1980). However, the district court also ruled that any banking expert, including Johnson, could testify about his examination of PCB files and

give his opinion of the creditworthiness of the borrowers. While Johnson was prohibited from bolstering his testimony by referring to findings in his report and could not reiterate the conclusions in the report, he could refer to his notes, including the report.

Forde concedes that the files themselves were admissible because they were admitted only for the notice they gave bank officers of the financial conditions of borrowers. Forde also concedes that the expert testimony exception to the hearsay rules, *see* Fed.R.Evid. 703, allows Johnson to rely on the reports in developing his own opinions.

■ Forde contends that Johnson's testimony constituted an impermissible "republication" of the report and should therefore be excluded as hearsay and a denial of Forde's right to confront witnesses. While testifying on how he classified loans, Johnson referred to the report to refresh his recollections, a practice permitted by Fed.R.Evid. 612. Johnson stated, in connection with the prosecution's attempt to refresh his recollection, that a particular loan "had to have been reviewed by someone or else it would not be in the report." Because he had no recollection, even after the attempted refreshing of his memory, the admission of the statement would have been error because the report was hearsay. However, the question and answer were stricken the next day. The trial judge committed no error on this point.

### C. Limits to Johnson's Expertise

■ We have condemned the practice of attempting to introduce law as evidence. *See Cooley v. United States*, 501 F.2d 1249, 1253–54 (9th Cir.1974), *cert. denied*, 419 U.S. 1123, 95 S.Ct. 809, 42 L.Ed.2d 824 (1975); *see also Marx & Co. v. Diners' Club, Inc.*, 550 F.2d 505, 509–10 (2d Cir.), *cert. denied*, 434 U.S. 861, 98 S.Ct. 188, 54 L.Ed.2d 134 (1977). The problems of using experts to displace the role of the trial judge are exacerbated here because the case is complex and an expert may receive undue attention from the jury. However, we have reviewed Johnson's testimony carefully. It correctly explains Regulation O. The trial judge's decision to let the testimony in, rather than explaining Regulation O in his instructions to the jury, is justified by the aid that it gave the jury in understanding other evidence presented as part of the prosecution's case. Any error on this point was not prejudicial.

### *Evidence of Fowler's Lifestyle*

David Cartwright testified that Fowler loaned Cartwright's wife a fur coat to attend a dinner, and that Fowler possessed "a wad of bills ... approximately that big in diameter, and all I could see was hundred-dollar bills". Fowler and Forde contend that the prejudicial effect "substantially outweighed" any probative value, and therefore that it should have been excluded under Fed.R.Evid. 403. Forde also claims that this testimony was irrelevant against him.

The prosecution offered the evidence to show Fowler's use of the facade of wealth, intentionally or not, to induce individuals to borrow from PCB and invest in Forde's various business ventures. The prosecution argues that the evidence was likewise relevant against Forde on the conspiracy count because Fowler's conduct was within the scope of the conspiracy.

■ There was sufficient evidence to support the inference that the use of apparent wealth to encourage investment in these enterprises was intentional and within the course of the conspiracy to make the evidence relevant against both Fowler and Forde.

Balancing prejudice against relevance is more complex. One juror mentioned the fur coat and the money to a coworker and asserted that "as far as he was concerned [the defendants] were buried." The district court unseated the juror, and individually questioned the remaining jurors to assure that none of them had discussed the case with anyone, including the excused juror. The fact that a juror excused before the case was submitted may have been prejudiced supports excusing the juror, not retrying the case.

The evidence was cumulative of other evidence of Fowler's methods. The prosecution needlessly risks leading the court into an abuse of discretion when it offers evidence with minimal probative value that could cause jurors to decide the case on legally irrelevant grounds. On retrial, evidence regarding the fur coat and wads of bills should not be offered unless clearly connected to specific conspiracy counts or particular loan transactions.

### Admission of Evidence That Unruh Suggested a Battery

Susan Adams, Schroeder's secretary, testified about a conversation in which Forde and Unruh discussed a bank loan by one Tumminello. According to Adams, Forde indicated he wanted Tumminello to pay the interest on the loan to Forde rather than to the FDIC. Unruh then asked Adams if she knew of any way to get Tumminello to "cooperate" and said she "could maybe send Higgins over to rough [Tumminello] up." The court admitted this evidence to show Forde's and Unruh's knowledge of Forde's interest in the loan. Forde and Unruh argue that the trial court abused its discretion by admitting testimony that Unruh suggested a battery and by giving the jury an improper limiting instruction.

■■■ Relevant evidence of crimes not charged in the indictment is admissible under Fed.R.Evid. 404(b) unless its only relevance is to show criminal disposition. *United States v. Bradshaw*, 690 F.2d 704, 708 (9th Cir.1982), *cert. denied*, 463 U.S. 1210, 103 S.Ct. 3543, 77 L.Ed.2d 1392 (1983). Such evidence may also be excluded under Rule 403. *Id.*

If the trial court admits evidence pursuant to Rule 404(b), it "should ordinarily instruct the jury carefully as to the limited purpose for which the evidence was admitted." *Bradshaw*, 690 F.2d at 709. Trial court decisions on limiting instructions are reviewed for an abuse of discretion. *See United States v. Multi-Management, Inc.*, 743 F.2d 1359, 1365 (9th Cir.1984).

### Prejudice

■■■ Forde and Unruh argue that the challenged testimony presented a danger of unfair prejudice that substantially outweighed any probative value. The prosecution argues that Unruh's suggestion tends to show her participation in the continuing conspiracy and awareness that the loans were wrong. We find neither error nor abuse of discretion in letting this testimony go to the jury.

When evidence is admitted pursuant to Fed.R.Evid. 404(b), the judge "should ordinarily instruct the jury carefully as to the limited purpose for which the evidence was admitted." *Bradshaw*, 690 F.2d at 709. Here the court instructed the jury to consider the evidence as pertaining only to Forde and Unruh and not to the other defendants. While the instruction did not limit the purposes for which the evidence could be used against Forde and Unruh, the instruction did them no harm. During the bench conference the trial judge told counsel what he planned to say to the jury in his limiting instruction, and counsel failed to object to the suggested instruction or request a more specific one. Consequently, the failure to give a proper limiting instruction, viewed in isolation, would not warrant reversal. *See Multi-Management*, 743 F.2d at 1364; *United States v. Sangrey*, 586 F.2d 1312, 1315 (9th Cir. 1978). On retrial, the point is not likely to recur.

### Aloha National Bank Loans

Forde contends that because the district court erroneously failed to dismiss counts 20 to 28 pertaining to the Aloha National Bank (ANB) transactions, the evidence introduced to prove those counts confused the jury and should have been excluded under Fed.R.Evid. 403. These transactions involved loans to purchase ANB stock, a bank Forde was interested in acquiring. The borrowers gave Forde an irrevocable proxy to vote the ANB stock securing the loan. Forde contends that because the bank was fully informed about the nature of the loans, the loans did not violate § 656.

Forde was not convicted on counts 20 to 28, but argues that he suffered prejudice from the admission of evidence relating only to those counts. Forde cites the testimony of ANB Chief Executive Officer Grounds; borrower-investors Karcher, Vick, and Von Medlin, and FDIC bank examiners Johnson and Miller.

The prosecution argues that the testimony of these witnesses was relevant to issues in the case other than the ANB counts. While some of the testimony of these witnesses related to the partnership loans, the testimony on Aloha National Bank itself was not relevant to the other crimes alleged. The evidence suggested that Fowler and perhaps Forde had defrauded those taking out loans by failing to live up to their commitments to repurchase the stock.

■ We have held that a loan to a solvent party, followed by a re-loan to a bank officer, may violate § 656. *See United States v. Kennedy*, 564 F.2d 1329, 1339 (9th Cir.1977), *cert. denied*, 435 U.S. 944, 98 S.Ct. 1526, 55 L.Ed.2d 541 (1978). Two circuits disagree. *See United States v. Gens*, 493 F.2d 216, 223 (1st Cir.1974); *United States v. Docherty*, 468 F.2d 989, 995 (2d Cir.1972). Our rationale was that the re-loan might lead the person borrowing from the bank to believe that the bank officer was responsible for repaying the loan, which might in turn reduce the likelihood of repayment. We find no prejudice to Forde in permitting the jury to hear the challenged evidence.

### Unruh's Motion for Judgment of Acquittal

At the close of the prosecution's case and again at the close of all the evidence, Unruh moved, pursuant to Fed.R.Crim.P. 29, for a judgment of acquittal as to all counts. The trial court denied these motions. Unruh argues on appeal that the trial court should have granted these motions as to counts 29 through 62, concerning the partnership loans, and counts 66 through 72, concerning mail fraud.

Unruh concedes that there was evidence showing that in the course of managing Forde's checking accounts she wrote checks disbursing the proceeds of the partnership loans, and checks sent to Dan Berger, the investor named in the mail-fraud counts. Unruh argues that there was no evidence that she was aware of the illegal nature of the partnership loans or of the correspondence with Berger, or that she intended to defraud or injure the bank or to employ the mails to advance a fraudulent scheme.

The first question is whether there was evidence from which a reasonable juror could have concluded that Unruh knew these activities were illegal. The prosecution cites no evidence that Unruh knew during the relevant period that the partnership loans mentioned in the indictment were illegal other than the evidence of her intimate daily involvement with Forde in disbursing the proceeds of those loans. Unruh knew she was writing many checks on accounts with insufficient funds, and arguably should have known that this was improper, but her intent in writing those checks is relevant to her participation in the check-kiting scheme, and not to her participation in the misapplication of the partnership loans. Once the partnership loan proceeds entered Forde's accounts, having come from escrow, Unruh's acts disbursing those proceeds were presumptively innocent unless Unruh knew that the partnership loans were misapplied funds originating from the PCB.

There was evidence, however, that Unruh knew that comparable partnership loans originated at San Marino Bank, another bank controlled by Forde. Shirley French, an operations officer at San Marino Bank, testified that on March 9, 1982, Unruh asked French to facilitate the signing and delivery of certain cashier's checks drawn on San Marino Bank. These checks were the proceeds of loans made by San Marino Bank and were payable to Western Mutual Escrow. None of the checks French testified about was the subject of a substantive count in the indictment, but this testimony showed that Unruh knew that partnership loans comparable to those

charged in the indictment originated at a bank that Forde controlled.

Even assuming that the Adams testimony suggests that Unruh knew there were improper aspects to the Tumminello loan, that conversation occurred in April 1983, more than a year after Unruh wrote the relevant checks, and the Tumminello loan was not a partnership loan. The prosecution cites no evidence that Unruh knew that the correspondence with Berger was illegal.

When the jury was discharged, it had failed to reach unanimous agreement on these counts. Therefore, some jurors apparently believed the evidence sufficient to convict Unruh on these counts.

 Assuming the counts should have been dismissed, we must determine whether a failure to dismiss those counts prejudiced Unruh. Unruh argues that sending the partnership-loan and mail-fraud counts against Unruh to the jury caused confusion and prejudice and invited a conviction based on compromise. However, that the jury convicted Unruh on only two counts and failed to convict her on the 42 counts for which the evidence appears to have been weaker suggests that the jury acted rationally and not out of confusion or prejudice. *See United States v. Kaplan,* 554 F.2d 958, 967 (9th Cir.), *cert. denied,* 434 U.S. 956, 98 S.Ct. 483, 54 L.Ed.2d 315 (1977). Thus, the error, if any, appears to have been harmless.

### Presumption of Innocence Instruction

Fowler contends that the district court abused its discretion by refusing to grant Fowler's request that the court give the instruction on the presumption of innocence found at 1 E.J. Devitt and C.E. Blackmar, Federal Jury Practice and Instructions § 11.14 (3d ed. 1977). The instruction actually given, adequately covers the presumption of innocence. The failure to give the precise language requested by Fowler is not error.

### Conflict of Interest

 Fowler contends that he was denied his sixth amendment right to effective assistance of counsel because his attorney, failed to inform him until just before trial that he had applied for employment with the United States Attorney. Fowler argues that this conflict of interest adversely affected his attorney's performance and requests a remand for an evidentiary hearing.

Fowler provides no evidence of misconduct. The brief asserts that counsel advised Fowler to plead guilty, and Fowler refused. However, nothing in the record suggests that counsel allowed anything adversely to affect his representation. Counsel cross-examined 16 prosecution witnesses, objected to evidence, and succeeded in having a juror excused for talking to a prosecution witness during a break.

Counsel's decision that Fowler should not testify was a matter of defense strategy. Witnesses testified that Fowler pressured them to take out loans and make investments, pressured them to sign partially blank documents, failed to obtain adequate credit information, and assured them that the investments were risk-free. Cross-examination of Fowler could have emphasized these points. Fowler has not shown that he was victimized by ill-advised strategy produced by counsel's alleged conflict of interest. The matter is an afterthought thrown into this appeal in the hope that if all else fails, the defendant may make a point by attacking his attorney.

### Conclusions

For the reasons stated, there must be a new trial on count two with respect to Forde and Unruh; on count eight with respect to Hopper; and on the partnership loan counts with respect to Forde and Fowler that were not withdrawn by the government. Counts upon which the jury failed to agree are also remanded. Count seven should be dismissed. The convictions on other counts are affirmed.

AFFIRMED in part; REVERSED and REMANDED in part.