897 A.2d 257

**Ramon CATALA**

v.

**STATE of Maryland.**

**No. 1952, Sept. Term, 2004.**

Court of Special Appeals of Maryland.

April 27, 2006.

442

Renee M. Hutchins, Michael Heyse (Michael Millemann, on the brief), Baltimore, for appellant.

Diane E. Keller (J. Joseph Curran, Jr., Atty. Gen., on the brief), Baltimore, for appellee.

Panel: MURPHY, C.J., SALMON, DEBORAH S. EYLER, JJ.

SALMON, J.

A jury in the Circuit Court for Cecil County found Ramon Catala (Catala) guilty of sixteen traffic charges, all arising out of a highspeed police chase that occurred on March 10, 2004.

Immediately after the jury announced its verdict, Michael Halter, Esq., trial counsel for Catala, asked that the jury be polled. All twelve jurors were polled, and they unanimously reaffirmed that they had found appellant guilty of all charges. Mr. Halter then asked the trial judge to permit his client to remain free on $7,500 bond. The court granted counsel's request.

The court next discussed an appropriate date for sentencing, and the following transpired:

MR. HALTER: Just to advise the court for the record, Your Honor, Mr. Eastridge [State's Attorney for Cecil County] is well aware, and I have advised my client I begin working for the State's Attorney's office on the 14th of this month [i.e., 12 days later].

THE COURT: You do what?

MR. HALTER: I begin working for the State's Attorney's office on the 14th of this month. I have advised my client of that. He's aware we will probably be doing substitution of counsel. So I will not be counsel at the sentencing.

THE COURT: All right. You are joining in the State's Attorney's office?

MR. HALTER: Yes, Your Honor.

THE COURT: All right. You are aware of that, sir?

THE DEFENDANT: Yes, sir.

THE COURT: And at the time of disposition you can engage other counsel. Can you get another lawyer?

THE DEFENDANT: I'm going to get another lawyer, Your Honor.

THE COURT: For disposition?

THE DEFENDANT: I am. And I was going to say—because I'm not guilty, Your Honor. And the guy that was driving the car, he was supposed to come here today with me, and I couldn't get ahold of him.

THE COURT: Well, that's all very interesting. It's also academic. You have been through a trial. You were found guilty. And that's—

THE DEFENDANT: And, Your Honor, on the evidence they were charging me—on what evidence are they charging [sic] me guilty?

THE COURT: The only thing I stopped doing fourteen years ago when I went on the bench was giving legal advice. You have got to talk to your attorney. As far as I'm concerned, the trial is finished except for the sentencing aspect.

THE DEFENDANT: Thank you, Your Honor.

On September 14, 2004, Mr. Halter filed a motion to withdraw as counsel for Catala. According to the motion, prior to trial, on August 12, 2004, Mr. Halter advised Catala at a "criminal motions hearing/status conference" that he had "accepted a position with the Maryland Office of the State's Attorney in and for Cecil County." Movant also said in his motion that he advised the defendant "that if for any reason any portion of the proceedings in this matter were to be scheduled later than September 24, 2004,"[1] he would be "forced to withdraw his appearance in this matter due to a conflict of interest."

Mr. Halter also said in his withdrawal motion that he gave the defendant "the option of retaining other counsel on August 12, 2004," which was sixteen days before trial was set to commence. Counsel's motion to withdraw also represented that the defendant, when he learned of his counsel's future employment plans, stated that "he wished for ... [Mr. Halter] to continue to represent him as long as he was able."

Mr. Halter concluded the motion by saying that he was "slated to begin" his new position on September 15, 2004, and that he would "obviously be unable to continue in this case because of the conflict of interest."

The Circuit Court for Cecil County, on October 6, 2004, granted Mr. Halter's motion to withdraw as counsel.

On October 21, 2004, Catala appeared at the sentencing hearing without counsel. The following exchange then occurred:

THE DEFENDANT: All right. The thing is, I've been trying to look for a good counsel because I did not feel comfortable with my last counsel. So I'm asking—I've been coming to court at the time I'm supposed to come. And though people saw that I made a mistake, I'm still 100

---

1. The September 24 date probably was a misprint. Logically, the date would be September 14, 2004.

percent that it was not me and they still found me guilty, Your Honor.

THE COURT: Sir, you have had a two-day jury trial.

THE DEFENDANT: I know.

THE COURT: Lots of people gave up their time to sit and listen to your case. There were a lot of witnesses. Those 12 people found you guilty beyond a reasonable doubt of being involved in these cases, some 13 [sic] different motor vehicle violations, two of which can put you in jail. The rest are fineable offenses. But fleeing and eluding on foot and fleeing and eluding by motor vehicle at speeds up to 130 miles per hour, smoking [sic] the police car and acting in an abhorrent way, outrageous driving behavior is what they found you guilty of.

THE DEFENDANT: The thing is, Your Honor—

THE COURT: Now, that's been months ago. That day your attorney told you in open court on the record that he was going to the State's Attorney's Office and could not be present to represent you in your sentencing.

THE DEFENDANT: In my sentencing, I know that.

THE COURT: You nodded, you agreed, and told the court that you would be getting your own attorney.

THE DEFENDANT: But I—

THE COURT: You're here without counsel. *You don't have an absolute right to counsel at sentencing like you do at the time of the guilt or innocence phase of the case. So you're here today for sentencing. Your request for a postponement is denied.* Now, have you talked to—

THE DEFENDANT: I haven't talked to no [sic] counsel.

THE COURT: I'm not talking about that. You had an attorney. You haven't talked to anybody. You've had plenty of time. You've made no efforts to get counsel; is that correct?

THE DEFENDANT: I made efforts, Your Honor. I made efforts, but I did not feel comfortable with speaking to them. I didn't feel because—

THE COURT: Well, did you go to the public defender?

THE DEFENDANT: No.

THE COURT: No. Okay.

(Emphasis added.)

There was no further discussion in regard to Catala's lack of representation. The court then segued to a discussion about whether appellant needed an interpreter. After that discussion, a Spanish-speaking interpreter was appointed. The court next considered the State's sentencing recommendations. The court, after giving Catala a chance to allocute, sentenced him to a total of two years' imprisonment with all suspended but ninety days. The court also imposed a fine of $7,500.

Catala filed this timely appeal and raises two questions:

1. Did the trial court err when, after receiving timely notice of a conflict of interest between Catala and his trial counsel, it failed to make any meaningful inquiry into the conflict or into whether the defendant knowingly and voluntarily waived his right to conflict-free counsel?

2. Did the trial court err when, after stating that Catala did not have a right to counsel at sentencing, it refused to grant a continuance so that the defendant could find sentencing counsel?

## I. *THE TRIAL*

Appellant's trial took place on September 2 and 3, 2004. The sole contested issue was whether appellant was driving the car involved in the highspeed chase. As shown below, the State introduced evidence, which, if believed, showed that appellant was the driver. Appellant, however, testified that he was simply a passenger in the vehicle involved in the chase and that the car was driven by one Rafael Paulhino.

## A. *The State's Evidence*

On March 10, 2004, at approximately 1:10 p.m., Maryland State Trooper Christopher Connor clocked a Nissan Maxima doing 72 miles per hour in a 65–mile–per–hour speed zone. Trooper Connor pulled the Nissan over to the shoulder of I–95, then got out of his marked police car and approached the Maxima. As he was walking toward the vehicle, the officer looked through the rear window of the Nissan and noticed that the driver was wearing a collared shirt. He also noticed, by looking at the passenger side mirror, that the front-seat passenger was wearing a crew-neck shirt with no collar. Additionally, he observed that both occupants of the vehicle had shaved heads.

Before Trooper Connor could talk to the driver, the Nissan Maxima sped away. Trooper Connor ran to his patrol car, activated all of his emergency equipment, and gave chase. Most of the chase that followed was videotaped by a camera in Trooper Connor's police vehicle.

Trooper Connor observed the Nissan cutting in and out of traffic, following cars too closely, passing on the shoulder, and generally operating the motor vehicle in an aggressive and negligent manner. During the chase the Nissan reached speeds in excess of 130 miles per hour on I–95. The Nissan then left I–95 and sped down narrow, winding roads in Cecil County.

One of the many police officers involved in the chase was Trooper First Class Watkins.[2] Trooper Watkins heard about the highspeed pursuit when he was in Harford County. He then drove to Route 222, near its intersection with Route 275. When advised that the Nissan was "heading back toward" Route 275, he started moving forward to get a "running start." When the fleeing Nissan passed his vehicle, the passenger side window was down, and Trooper Watkins had a "clear line of sight of the passenger," but not the driver. According to Trooper Watkins, Catala "was definitely not the passenger."

---

2. The record does not reveal Trooper Watkins's first name.

The chase continued as the Nissan re-entered Route I–95 and later exited the interstate highway and drove into the truck parking lot at the Chesapeake House Restaurant. Trooper Watkins followed the Nissan into the parking lot.

Although Trooper Watkins did not see the Nissan come to a stop, its tires were still "smoking" when Watkins arrived. Trooper Watkins then saw Catala running away from the driver side of the Nissan. He also saw the passenger getting out of the Nissan on the passenger side. The man exiting the passenger side took "about two steps" and stopped. He did not appear to Trooper Watkins to be "trying to run." In contrast, Trooper Watkins saw appellant "running from the driver side of the vehicle" toward the front of the tractor trailers that were parked nearby; appellant next ran across the grassy area and then began "walking quickly forward." Trooper Watkins got out of his vehicle and apprehended appellant.

Appellant was searched incident to his arrest. The police found an ignition key to the Nissan in Catala's wallet; they also found a large amount of cash in his jacket. After appellant's apprehension, it was discovered that he had a suspended New York driver's license.

Trooper Connor testified that at the time of appellant's arrest Catala was wearing a collared shirt and a tan coat.[3] The person who had exited from the passenger side of the vehicle, however, had a crew-neck shirt with no collar and a "bad arm."

## B. *Testimony of Appellant*

Appellant testified that on March 10, 2004, he was a passenger in the Nissan involved in the highspeed chase. The vehicle was driven by Rafael Paulhino. According to Catala's testimony, during the chase he was "scared" and implored Paulhino on numerous occasions to stop the car. When the

---

**3.** Trooper Connor testified that Catala was not wearing the tan jacket, which had a large amount of cash in it, when he first observed him, prior to the chase.

car was finally stopped by Paulhino, appellant exited the vehicle from the passenger side. He also saw Paulhino exiting from the same side because the driver side door had been damaged by the Nissan's collision with one of the pursuit vehicles. Although appellant denied that he ran from the scene, he admitted that he was walking away from the Nissan when apprehended. In his words, he "jumped out of the car because I'm not going to get—I have problems already."

Catala further testified that about five minutes after the vehicle was stopped he voluntarily told Trooper Connor that he had a spare key to the Nissan in his pocket. He said that he told the trooper this because the police were "talking about calling a locksmith" to "get the car" and impound it.[4] He also testified that he told Trooper Connor about the key in his wallet because the trooper was "so mad at me that he didn't want to listen."

## II. *ISSUE 1*

■ In regard to the first issue presented, appellant makes three interrelated contentions, viz., (1) because his trial attorney had accepted a job with the State's Attorney's Office for Cecil County while representing him, his attorney had an actual conflict of interest that disqualified him as counsel; (2) the conflict of interest was brought to the trial judge's attention during trial—yet the trial judge failed to make inquiry regarding that conflict; and (3) therefore, pursuant to the holding by the Supreme Court in *Holloway v. Arkansas*, 435 U.S. 475, 98 S.Ct. 1173, 55 L.Ed.2d 426 (1978), he was entitled to a new trial without the necessity of proving actual prejudice.

■ Under the Sixth Amendment to the United States Constitution and Article 21 of the Maryland Declaration of Rights, a defendant in a criminal case is entitled to be

---

**4.** The State called Troopers Watkins and Connor in rebuttal. Both denied appellant's testimony that he voluntarily told any police officer that the key was in his wallet.

represented by an attorney who is free from conflicts of interest. *See Mickens v. Taylor,* 535 U.S. 162, 122 S.Ct. 1237, 152 L.Ed.2d 291 (2002); *Lettley v. State,* 358 Md. 26, 33–34, 746 A.2d 392 (2000); *Austin v. State,* 327 Md. 375, 381, 609 A.2d 728 (1992).

The right to effective assistance of counsel in the conflict-free sense has been addressed by the Supreme Court in four significant cases, which, in chronological order, are: *Glasser v. United States,* 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942); *Holloway v. Arkansas, supra; Cuyler v. Sullivan,* 446 U.S. 335, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980); and *Mickens, supra.* The first three of these cases were discussed, in detail, by the Court of Appeals in *Lettley,* 358 Md. at 35–38, 746 A.2d 392. The import of *Mickens,* which was decided two years after *Lettley,* has not heretofore been addressed by the Court of Appeals.

Glasser, along with four co-defendants, was charged with conspiracy to defraud the United States. One of Glasser's co-defendants was one Kretske. 315 U.S. at 63, 62 S.Ct. 457. On the second day of trial, Kretske dismissed his retained counsel, and the court appointed one of Glasser's attorney's (Stewart) to represent him. Prior to the appointment, Stewart told the trial judge about the divergent interests of Glasser and Kretske. Glasser also advised the court that he wanted his own lawyer to represent him. *Id.* at 69, 62 S.Ct. 457. After some discussion, Stewart agreed to the appointment, and the trial proceeded. Both Kretske and Glasser, along with two other defendants, were convicted. The Supreme Court reversed Glasser's conviction. *Id.* at 76, 62 S.Ct. 457. In doing so, the Court agreed with Glasser's contention that Stewart's representation of Kretske had prevented Stewart from objecting to certain incompetent evidence and from cross-examining a prosecution witness. *Id.* The court described these lapses on the part of Stewart as "illuminat[ing] the cross purposes under which he was laboring" and "indicative of Stewart's struggle to serve two masters." *Id.* at 73, 75, 62 S.Ct. 457. The reversal of Glasser's conviction was based on the fact that

counsel's conflict of interest violated his right to effective assistance of counsel. *Id.* at 75, 62 S.Ct. 457.

In *Holloway v. Arkansas,* three men were charged with robbery and rape, arising out of an incident that occurred at a Little Rock restaurant. 435 U.S. at 477, 98 S.Ct. 1173. A single public defender was assigned to represent all three defendants. *Id.* Prior to trial, one of the defendants moved to allow the introduction of a statement he made to officers at the time of his arrest; in that statement, he denied participating in the rapes. The public defender, perceiving a potential conflict of interest, filed a motion for appointment of separate counsel "because 'the defendants ha[d] stated to him that there is a possibility of a conflict of interest in each of their cases....' " *Id.* at 477, 98 S.Ct. 1173. The motion for separate counsel was denied. *Id.* Later, on the morning of trial, defense counsel requested a severance " 'on the grounds that one or two of the defendants may testify and ... I will not be able to cross-examine them because I have received confidential information from them.' " *Id.* at 478, 98 S.Ct. 1173. This motion, too, was denied. After the State rested its case, defense counsel notified the court that all three defendants wished to testify. Trial counsel once again objected to his representation of all the defendants. The objection was overruled. All three defendants subsequently testified, and all were convicted on all counts. *Id.* at 481, 98 S.Ct. 1173. After the convictions were affirmed by the Arkansas Supreme Court, the United States Supreme Court granted defendant's petition for *writ of certiorari.* The issue presented was whether requiring a single attorney to represent all three men, notwithstanding a timely objection by defense counsel, violated their right to effective assistance of counsel.

In *Lettley,* the Court of Appeals summarized the holding in *Holloway* as follows:

The Court held that this "failure, in the face of the representations made by counsel *weeks before trial and again before the jury was empaneled,* deprived petitioners of the guarantee of 'assistance of counsel.' " [435 U.S. at 484, 98 S.Ct. 1173.] Recognizing that joint representation is not

per se violative of the constitutional guarantee of effective assistance of counsel, the Court nonetheless said that "since the decision in *Glasser*, most courts have held that an attorney's request for the appointment of separate counsel, based on his representations as an officer of the court regarding conflict of interests, should be granted." *Id.* at 485, 98 S.Ct. 1173.

Turning to the question of proof of prejudice, the *Holloway* Court concluded that prejudice is presumed, regardless of whether it was shown independently. *See id.* at 489, 98 S.Ct. 1173. The Court "read the Court's opinion in *Glasser* ... as holding that whenever a trial court improperly requires joint representation over timely objection reversal is automatic." *Id.* at 488, 98 S.Ct. 1173. The Court recognized that joint representation of conflicting interests is suspect because of what it tends to prevent the attorney from doing, and that a rule requiring a defendant to show that a conflict, which he and his counsel tried to avoid by timely objection, prejudiced him in some specific fashion would not be susceptible of intelligent, evenhanded application. *See id.* at 490, 98 S.Ct. 1173. Again rejecting a harmless error standard, the Court said:

> But in a case of joint representation of conflicting interests the evil—it bears repeating—is in what the advocate finds himself compelled to *refrain* from doing, not only at trial but also as to possible pretrial plea negotiations and in the sentencing process. It may be possible in some cases to identify from the record the prejudice resulting from an attorney's failure to undertake certain trial tasks, but even with a record of the sentencing hearing available it would be difficult to judge intelligently the impact of a conflict on the attorney's representation of a client. And to assess the impact of a conflict of interests on the attorney's options, tactics, and decisions in plea negotiations would be virtually impossible. Thus an inquiry into a claim of harmless error here would require, unlike most cases, unguided speculation.

*Id.* at 490–91, 98 S.Ct. 1173.

*Lettley,* 358 Md. at 36–37, 746 A.2d 392 (emphasis added).

In *Cuyler v. Sullivan,* John Sullivan and two other men were charged with first-degree murder; all three defendants were represented by the same two privately retained attorneys. 446 U.S. at 338, 100 S.Ct. 1708. Each of the defendants was tried separately, and Sullivan, the first to be tried, was convicted of all charges and sentenced to life imprisonment. *Id.* Sullivan's conviction was upheld on direct appeal; he thereafter sought relief under Pennsylvania's post-conviction hearing act. At the post-conviction hearing, one of Sullivan's trial attorneys maintained that he and his co-counsel acted jointly in representing two defendants; the other trial counsel claimed, however, that one of the attorneys acted as lead counsel for Sullivan and the other acted in that capacity for the other two defendants. *Id.* at 338–39, 100 S.Ct. 1708. After post-conviction relief was denied, Sullivan sought federal *habeas corpus* relief in the Eastern District of Pennsylvania. *Id.* at 338, 100 S.Ct. 1708. The district court denied *habeas corpus* relief, but the Third Circuit reversed. *See United States ex rel. Sullivan v. Cuyler,* 593 F.2d 512, 519 (3d Cir.1979). The Third Circuit held that "[a] state conviction cannot stand when an examination of the record reveals that representation by independent counsel 'might have made a difference in defense strategy.' " *Id.* at 520–21. The Supreme Court reversed the decision of the Third Circuit and held:

> *Holloway* requires state trial courts to investigate timely objections to multiple representations. *But nothing in our precedents suggests that the Sixth Amendment requires state courts themselves to initiate inquiries into the propriety of multiple representation in every case.* Defense counsel have an ethical obligation to avoid conflicting representations and to advise the court promptly when a conflict of interest arises during the course of trial. Absent special circumstances, therefore, *trial courts may assume either that multiple representation entails no conflict or that the lawyer and his clients knowingly accept such risks of*

*conflicts as may exist....* Unless the trial court knows, or reasonably should know, that a particular conflict exists, the court need not initiate an inquiry.

446 U.S. at 346–47, 100 S.Ct. 1708 (emphasis added) (footnotes omitted).

Of particular import to the case at hand, the *Cuyler v. Sullivan* Court said: "In order to establish a violation of the Sixth Amendment, a defendant who raises no objection *at trial* must demonstrate that an actual conflict of interest adversely affected his lawyer's performance." *Id.* at 348–49, 100 S.Ct. 1708 (emphasis added) (footnote omitted). The *Cuyler* Court also said that a trial court must inquire into a conflict of interest when it "knows, or reasonably should know that particular conflict exists." *Id.* at 347, 100 S.Ct. 1708.

*Mickens* involved the resolution of the question as to what a defendant must prove on appeal in a situation where no objection was raised at trial concerning conflict of interest, even though the trial judge fails to make the inquiry mandated by *Cuyler,* i.e., the court failed to inquire into a conflict of interest when it "knows or should know that a particular conflict exists." Mickens was accused of murdering a seventeen-year-old boy named Timothy Hall. 535 U.S. at 164, 122 S.Ct. 1237. Prior to his death, Hall had been represented by one Bryan Saunders, Esq., on charges that he had assaulted his mother and possessed concealed weapons. Because of Hall's death, Saunders was relieved of his obligation of representing Hall by Juvenile Court Judge Aundria Foster. *See Mickens v. Taylor,* 240 F.3d 348, 354 (4th Cir.2001).

Three days later, Judge Foster assigned Saunders to represent Mickens on the charge that Mickens had murdered Hall. Thereafter, Saunders never advised either the trial judge or Mickens that he had previously represented the murder victim. Mickens was convicted of first-degree murder and given the death penalty. *Mickens v. Taylor,* 535 U.S. at 164, 122 S.Ct. 1237. Mickens first learned that one of his attorneys had represented the murder victim when another lawyer, who was appointed to represent him in a federal *habeas corpus*

proceeding, reviewed Hall's juvenile file and discovered the dual representation. Mickens then filed a *writ of habeas corpus* in the Eastern District of Virginia, in which he alleged that he was denied effective assistance of counsel during his trial. *See Mickens v. Greene,* 74 F.Supp.2d 586 (E.D.Va.1999). The district court judge, without condoning the conduct of Saunders in failing to disclose his previous representation to the trial court, found as a factual matter that Saunders did not believe that he had any continuing duty to Hall that might have interfered with his consideration of all the facts and options available to Mickens. Under the first part of the test set forth in *Cuyler v. Sullivan,* the trial court found that there was no actual conflict of interest. Under the second part of the *Cuyler v. Sullivan* inquiry, the prejudice prong, the district court concluded that Mickens had not been prejudiced by a conflict of interest.

The U.S. Court of Appeals for the Fourth Circuit initially reversed the district court's decision. *Mickens v. Taylor,* 227 F.3d 203 (4th Cir.2000). But later, an *en banc* panel of the Fourth Circuit rejected Mickens's contention that the *Cuyler v. Sullivan* case "mandates a reversal when the trial court has failed to make an inquiry even though [the court] 'knows or reasonably should know that a particular conflict exists.' " *Mickens v. Taylor,* 240 F.3d at 358 n.5.

The Supreme Court granted *certiorari,* 532 U.S. 970, 121 S.Ct. 1651, 149 L.Ed.2d 467 (2001), and framed the issue to be decided as follows: "The question presented in this case is what a defendant must show in order to demonstrate a Sixth Amendment violation where the trial court fails to inquire into a potential conflict of interest about which it knew or should have known." 535 U.S. 162, 164, 122 S.Ct. 1237, 152 L.Ed.2d 291 (2002). Justice Scalia, speaking for a five-four majority, distinguished between a *Holloway v. Arkansas* duty to inquire and the type of duty mentioned in *Cuyler v. Sullivan.* Justice Scalia said for the majority:

> In *Holloway v. Arkansas,* 435 U.S. 475, 98 S.Ct. 1173, 55 L.Ed.2d 426 (1978), defense counsel had objected that he could not adequately represent the divergent interests of

three codefendants. *Id.,* at 478–480, 98 S.Ct. 1173. Without inquiry, the trial court had denied counsel's motions for the appointment of separate counsel and had refused to allow counsel to cross-examine any of the defendants on behalf of the other two. The *Holloway* Court deferred to the judgment of counsel regarding the existence of a disabling conflict, *recognizing that a defense attorney is in the best position to determine when a conflict exists, that he has an ethical obligation to advise the court of any problem, and that his declarations to the court are "virtually made under oath." Id.* at 485–486, 98 S.Ct. 1173 (internal quotation marks omitted). *Holloway* presumed, moreover, that the conflict, "which [the defendant] and his counsel tried to avoid by timely objections to the joint representation," *id.,* at 490, 98 S.Ct. 1173, undermined the adversarial process. The presumption was justified because joint representation of conflicting interests is inherently suspect, and because counsel's conflicting obligations to multiple defendants "effectively sea[l] his lips on crucial matters" and make it difficult to measure the precise harm arising from counsel's errors. *Id.* at 489–490, 98 S.Ct. 1173. *Holloway* thus creates an automatic reversal rule only where defense counsel is forced to represent codefendants over his timely objection, unless the trial court has determined that there is no conflict. *Id.,* at 488, 98 S.Ct. 1173 ("[W]henever a trial court improperly requires joint representation over timely objection reversal is automatic").

In *Cuyler v. Sullivan,* 446 U.S. 335, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980), the respondent was one of three defendants accused of murder who were tried separately, represented by the same counsel. Neither counsel nor anyone else objected to the multiple representation, and counsel's opening argument at Sullivan's trial suggested that the interests of the defendants were aligned. *Id.,* at 347–348, 100 S.Ct. 1708. We declined to extend *Holloway's* automatic reversal rule to this situation and held that, *absent objection, a defendant must demonstrate that "a conflict of interest actually affected the adequacy of his representa-*

*tion.*" 446 U.S. at 348–349, 100 S.Ct. 1708, 64 L.Ed.2d 333. In addition to describing the defendant's burden of proof, *Sullivan* addressed separately a trial court's duty to inquire into the propriety of a multiple representation, *construing Holloway to require inquiry only when "the trial court knows or reasonably should know that a particular conflict exists,"* 446 U.S. at 347, 100 S.Ct. 1708, 64 L.Ed.2d 333— which is not to be confused with when the trial court is aware of a vague, unspecified possibility of conflict, such as that which "inheres in almost every instance of multiple representation," *id.,* at 348, 100 S.Ct. 1708. In *Sullivan,* no "special circumstances" triggered the trial court's duty to inquire. *Id.,* at 346, 100 S.Ct. 1708.

535 U.S. at 167–169, 122 S.Ct. 1237 (emphasis added) (footnote omitted).

Justice Scalia went on to say for the majority:

The trial court's awareness of a potential conflict neither renders it more likely that counsel's performance was significantly affected nor in any way renders the verdict unreliable. *Cf. United States v. Cronic,* 466 U.S., at [648], n. 31, 104 S.Ct. 2039 [80 L.Ed.2d 657 (1984)]. Nor does the trial judge's failure to make the *Sullivan*—mandated inquiry often make it harder for reviewing courts to determine conflict and effect, particularly since those courts may rely on evidence and testimony whose importance only becomes established at the trial.

Nor, finally, is automatic reversal simply an appropriate means of enforcing *Sullivan's* mandate of inquiry. Despite Justice Souter's belief that there must be a threat of sanction (to wit, the risk of conferring a windfall upon the defendant) in order to induce "resolutely obdurate" trial judges to follow the law, *post,* at 1263, we do not presume that judges are as careless or as partial as those police officers who need the incentive of the exclusionary rule, see *United States v. Leon,* 468 U.S. 897, 916–17, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984). And in any event, the *Sullivan* standard, which requires proof of effect upon representation but (once such effect is shown) presumes prejudice, already

creates an "incentive" to inquire into a potential conflict. In those cases where the potential conflict is in fact an actual one, only inquiry will enable the judge to avoid all possibility of reversal by either seeking waiver or replacing a conflicted attorney. We doubt that the deterrence of "judicial dereliction" that would be achieved by an automatic reversal rule is significantly greater.

Since this was not a case in which (as in *Holloway*) counsel protested his inability simultaneously to represent multiple defendants; and since the trial court's failure to make the *Sullivan*-mandated inquiry does not reduce the petitioner's burden of proof; *it was at least necessary, to void the conviction, for petitioner to establish that the conflict of interest adversely affected his counsel's performance.* The Court of Appeals having found no such effect, see 240 F.3d at 360, the denial of *habeas* relief must be affirmed.

*Id.* at 173–174, 122 S.Ct. 1237 (emphasis added).

■ In the case *sub judice,* appellant contends that the rule set forth in *Cuyler v. Sullivan, supra,* and reiterated in *Mickens v. Taylor, supra,* is inapplicable. To reiterate, that rule is: "[A] defendant who raised no objection at trial, must demonstrate that an actual conflict of interest adversely affected his lawyer's performance." *Mickens,* 535 U.S. at 193, 122 S.Ct. 1237 (quoting *Cuyler,* 446 U.S. at 348, 100 S.Ct. 1708) (footnote omitted).

The State argues that the just-mentioned rule *is* applicable because at no time *during trial* did either appellant or his counsel ever mention a potential conflict of interest or give the trial judge any reason to believe that a conflict existed. Therefore, in the State's view, appellant is required to show that the conflict of interest alleged adversely affected his lawyer's performance.

We agree with the State that the rule set forth in *Cuyler* is here applicable.

In this case, there was only one trial. Under any definition of the term, the "trial" was concluded when the verdict was

returned by the jury. The fact that appellant's conviction was not final for appeal purposes has nothing to do with whether an objection was made at trial. In this case, no objection to the alleged conflict occurred prior to the time the verdict was announced. Moreover, even after trial, neither appellant nor his counsel ever "objected" to a conflict of interest. In fact, a post trial motion by appellant's trial counsel affirmatively showed that (1) the defendant knew about his counsel's future employment plans over three weeks before trial and (2) despite such knowledge, told counsel he wanted him to continue as his lawyer.

In his reply brief, appellant relies upon language in *Cuyler v. Sullivan,* which imposes upon the trial court the duty to make inquiry when it knows, or reasonably should know, that a conflict of interest exists. *Cuyler,* 446 U.S. at 347, 100 S.Ct. 1708. Appellant points out that the duty to inquire extends post trial (*see Wood v. Georgia,* 450 U.S. 261, 101 S.Ct. 1097, 67 L.Ed.2d 220 (1981)) and exists whether there is an objection or not. *Id.* at 262, 101 S.Ct. 1097. But, as the Supreme Court held in *Mickens, supra,* the failure to make such inquiry when a conflict of interest comes to the court's attention will not result in automatic reversal; instead, to be entitled to reversal, the defendant must show (1) that an actual conflict of interest existed during trial and (2) that the actual conflict adversely affected his lawyer's performance.

Appellant has failed to show that an actual conflict of interest existed. Moreover, even if appellant had been able to persuade us that acceptance of a job with the State's Attorney's Office constituted an "actual conflict of interest," the record before us in no way supports the conclusion that the "conflict" adversely affected Mr. Halter's performance.

In an effort to prove that an "actual" conflict of interest existed, appellant argues: (1) because Mr. Halter was to begin employment with the State's Attorney's Office within two weeks of trial, he was "directly linked to an entity that would benefit from [Catala's] conviction"; (2) a conviction of Catala would "bolster the public perception of" the Cecil County

State's Attorney's Office as an agency "that properly protects the people while doing justice"; (3) if the State's Attorney's office did not consistently obtain convictions, "the public would likely question the agency's management and abilities to protect the citizen from dangerous criminals"; (4) the conflict of interest was "compounded because [Mr. Halter's] future colleague sat across the aisle from him during the entire trial"; (5) "it is fair to conclude that trial counsel might not act in his client's best interest by objecting to his opposition's transgressions so as to maintain a desired level of camaraderie with his future co-worker"; and (6) Mr. Halter's cross-examination of the two Maryland state troopers who testified was less than zealous in an effort by Mr. Halter "to insure a solid working relationship with them once he joined the State's Attorney's Office."

In *Mickens,* Justice Scalia said for the majority: "[W]e think 'an actual conflict of interest' meant precisely a conflict *that affected counsel's performance*—as opposed to a mere theoretical division of loyalties." 535 U.S. at 171, 122 S.Ct. 1237 (emphasis in original); *see also, id.* at 172 n. 5, 122 S.Ct. 1237 ("An 'actual conflict,' for Sixth Amendment purposes, is a conflict of interest that adversely affects counsel's performance.").

The "conflict" relied upon by appellant constituted a mere theoretical conflict of interest, as opposed to an actual conflict. Mr. Halter, at the time of trial, had no reason to want to "curry favor" with his new employer because he had already been hired more than three weeks before trial. And nothing in the record supports appellant's suggestion that Mr. Halter was less than zealous in his cross-examination of Troopers Connor and Watkins. Absent some fact not shown in this record, it would be absurd to believe that it is likely that a licensed Maryland attorney would give less than zealous performance on behalf of his client in a low-profile traffic case such as this one merely because he had accepted future employment with the prosecutor's office. *See Burger v. Kemp,* 483 U.S. 776, 784, 107 S.Ct. 3114, 97 L.Ed.2d 638 (1987) ("[W]e generally presume that a lawyer is fully conscious of

the overarching duty of complete loyalty to his or her client."). *See also Holloway v. Arkansas*, 435 U.S. at 485, 98 S.Ct. 1173 (defense attorneys who have an obligation to determine whether a conflict exists are in the best position to recognize the existence of an actual conflict of interest)

The case of *Garcia v. Bunnell*, 33 F.3d 1193 (1994), is directly on point. Garcia was tried by a state court in California for first-degree murder and related offenses. *Id.* at 1194. At trial, Garcia was represented by Craig Holmes, Esq. *Id.* On the morning of trial, Mr. Holmes announced that he had accepted employment with the San Joaquin County State's Attorney's Office and was scheduled to begin his appointment as soon as the subject trial ended. *Id.* at 1194–95. Holmes's prospective employer was the same office that was prosecuting Garcia. *Id.* Garcia was convicted of all charges in the state court. He then brought a *writ of habeas corpus* in federal court in which he contended that "in obtaining his conviction the State violated his Sixth Amendment right to conflict-free representation." *Id.* at 1195. The District Court, after an evidentiary hearing, ruled that there was no actual conflict of interest and, accordingly, denied Garcia's petition. *Id.*

On appeal, the U.S. Court of Appeals for the Ninth Circuit assumed, for the purpose of argument, that Garcia had timely objected to Holmes's representation, but nevertheless affirmed the denial of *habeas corpus* relief. The *Garcia* Court said:

The mere fact of Holmes' future employment plans did not create an actual conflict. In *United States v. Unruh*, 855 F.2d 1363 (9th Cir.1987), *cert. denied*, 488 U.S. 974, 109 S.Ct. 513, 102 L.Ed.2d 548 (1988), we held that defense counsel's application for employment as an assistant United States attorney, disclosed to the defendant just before trial, did not constitute a conflict where "nothing in the record suggests that counsel allowed anything adversely to affect his representation." *Id.* at 1379. Similarly, in *United States v. Horton*, 845 F.2d 1414 (7th Cir.1988), defense counsel in federal district court was a finalist for appoint-

ment as the United States Attorney for that district at the same time as he counseled his client to accept a plea agreement. Responding to the defendant's Sixth Amendment conflict of interest challenge, the Seventh Circuit held: "We will not indulge the presumption that a defense attorney who is being considered for a position as United States Attorney is unable to represent a defendant in federal court to the best of his ability and with the defendant's best interests in mind." *Id.* at 1419.

Here, where Holmes already had the district attorney job, the potential for conflict was certainly no greater than that faced by counsel in *Unruh* and *Horton,* who were seeking employment with the prosecutor's office while representing a defendant. *Given the inherently transitory nature of representation in the area of criminal law, as well as the potentially unlimited reach of the guilt-by-association logic Garcia would have us apply, we must significantly rely on the integrity of counsel in evaluating such potential conflicts.*

33 F.3d at 1199 (emphasis added).

Based on *Garcia,* and the authorities cited therein, we hold that this record fails to show an actual conflict of interest.[5]

▇▇ Appellant voices several criticisms of Mr. Halter's trial performance. For the sake of completeness, we shall discuss his major criticisms even though no actual conflict of interest has been shown and shall hold that none of the criticisms have merit. Moreover, even if every criticism were valid, *none* of the alleged lapses were shown to be caused by the fact that Mr. Halter had accepted a job with the prosecutor's office.[6]

---

5. Appellant, in his brief, cites no cases that have ruled contrary to *Garcia.*

6. In order for reversal to be warranted when no actual conflict has been shown, appellant must demonstrate not only that Mr. Halter's representation was deficient, but also "a reasonable probability that, but for counsel's unprofessional errors, the results of the [trial] would have been different." *Strickland v. Washington,* 466 U.S. 668, 694, 104

Appellant argues that "the State's case was easy to attack," but nevertheless Mr. Halter "failed to offer easily obtainable evidence showing that Mr. Catala was not the owner of the car involved in the police chase, and that ... [Mr. Paulhino] owned the car."

It may be true that the State's case was "easy to attack," but our review of the record indicates that it was not easy to attack successfully. The car chase happened in the early afternoon hours. Thus, the lighting was good. Trooper Watkins, whose vehicle was moving approximately 55 to 60 miles an hour, testified that the passenger window of the Nissan was open, and he could clearly see the passenger of the Nissan as it sped past his cruiser. The trooper further testified that it was not hard to make a positive identification of the passenger under such circumstances and that appellant definitely was not the passenger he saw. Moreover, Trooper Watkins saw the person whom he had earlier seen in the passenger seat, leaving the Nissan via the passenger door. Because, according to the police testimony, the doors of the Nissan were operable, it is extremely unlikely that the driver would make his escape by leaving from the passenger side.

Trooper Connor's testimony was likewise not easy to attack successfully. He knew that appellant was the driver because he was wearing a collared shirt when arrested. The passenger had a shirt with no collar. Unless trial counsel could convince the jury that Trooper Connor was lying or that the passenger and the driver switched shirts during a highspeed chase, the jury could infer, legitimately, that appellant was the driver. That inference was supported by the fact that appellant was seen running from the driver side of the vehicle immediately after the highspeed car chase ended. All this evidence, coupled with the fact that appellant had a key to the Nissan in his wallet, constituted strong evidence against him. Contrary to appellant's suggestion, Mr. Halter did not have an easy case to defend.

---

S.Ct. 2052, 80 L.Ed.2d 674 (1984). Appellant does not even argue that the evidence in this record meets the *Strickland* standard.

■ Appellant bitterly complains that Mr. Halter's representation was deficient because he failed to present "easily obtainable" evidence showing that Mr. Paulhino owned the Nissan. It may be true that Mr. Halter easily could have proven that appellant did not own the Nissan, but such proof would not have negated, or in any way have weakened, the testimony of the State's witnesses that showed that appellant *was driving* the Nissan.

■ Appellant also argues that Mr. Halter's performance was deficient because he failed "to make a diligent effort to make sure of the car owner's presence at Mr. Catala's trial." We reject that argument. First, no such lack of due diligence is shown in the record. In any event, even if we were to assume that counsel, with appropriate diligence, could have secured Mr. Paulhino's attendance at trial, such an effort on Mr. Halter's part, in all likelihood, would not have benefitted appellant. Appellant apparently believes otherwise, based on the thought that Paulhino, if he had been subpoenaed to trial, would have admitted that he was the driver. This possibility is remote—in the extreme—in light of Paulhino's constitutional right to refuse to incriminate himself. After all, if Paulhino had made such an admission on the stand and appellant had been acquitted, Paulhino would face the very real possibility of standing trial for the numerous serious traffic offenses for which appellant received jail time.

■ Another criticism of trial counsel voiced by appellant is that during trial the State "twice mentioned Mr. Catala's post-arrest silence," yet defense counsel "offered no objection" to preserve Catala's constitutional right to silence. There is no merit in this criticism.

At trial, Catala testified that he *did* make a post-arrest statement to the police in which he told them that the key to the Nissan was in his wallet. Defense counsel asked Trooper Watkins during cross-examination whether his client had made any statements to him after he was apprehended. The trooper said that he had not. On redirect examination, the prosecution asked Trooper Watkins essentially the same ques-

tion as had defense counsel and got the same answer. An objection to the prosecutor's question on the ground now advanced would have been frivolous.

In closing argument, the prosecutor made an argument that directed the jury's attention to the fact that appellant's testimony that he had told the officer that there was a key in his wallet was rebutted by two state troopers who said that appellant "never said that at all." There was nothing improper about that argument. Therefore, appellant's claims that Mr. Halter should have objected to it is without merit.

 Appellant also criticizes Mr. Halter's performance because he filed "form motions" that "contained irrelevant objections and arguments unrelated to the subject case." Appellant's counsel filed an omnibus motion to suppress certain evidence, as well as a motion to dismiss. It is true, as appellant points out, that these form motions did not address matters germane to the highspeed chase with which appellant was charged. There was, in fact, no evidence illegally obtained, nor was there any legitimate reason to dismiss any of the charges. But, appellant fails to indicate how he was prejudiced by those filings. More importantly, it is obvious that there was no possible prejudice.[7]

 Appellant also complains that trial counsel's performance was deficient because, on two occasions, he should have, but did not, object to the prosecutor's closing argument. According to appellant, objections should have been made when the prosecutor "told the jury that police officers have special perception skills" and when he "speculated about Mr.

---

7. Appellant also says that Mr. Halter should have objected "when the prosecutor had one witness [Trooper Watkins] interpret a diagram in court by another prosecution witness." The short answer to that criticism is that, at least at the page in the transcript to which we are referred, Trooper Watkins did not "interpret" the diagram drawn by Trooper Connor. Instead, Trooper Watkins did what witnesses frequently do in traffic cases; he simply used a diagram prepared by another witness to show the jury the actions that were taken by him and others. The reasons that Mr. Halter did not object is evident, i.e., there was no sound basis for doing so.

Catala's mental state" immediately after the car chase. At the pages in the record to which appellant's counsel refers us, the prosecutor did not tell the jury that police officers have special perception skills, nor did he speculate concerning appellant's "mental state immediately after the car chase." In any event, such criticisms amount to quibbles about trifles. Even if, theoretically, a successful objection to any portion of the closing argument could have been made, it does not follow that an objection *should* be made. As the Court of Appeals said in *United States v. Molina,* 934 F.2d 1440 (9th Cir.1991), "[M]any trial lawyers refrain from objecting during closing argument to all but the most egregious misstatements by opposing counsel on the theory that the jury may construe their objections to be a sign of desperation or hyper-technicality." Failure to object to this type of argument is usually a matter of trial strategy and certainly not indicative of sub-par performance. We note that most experienced trial lawyers know that it is oftentimes bad strategy to object during an opponent's closing argument.

██ Appellant also criticizes his trial counsel for not explicitly arguing to the jury that the videotape of the highspeed chase did not show appellant exiting the vehicle. This does not constitute deficient performance. The Nissan was able to get sufficiently ahead of the police car equipped with the videotape camera so that the Nissan's stop and the passengers' exit could not be filmed. Under such circumstances, we fail to see why defense counsel should have been criticized for not pointing out what the jury had just seen for themselves.

In sum, we can discern nothing in the record that supports appellant's contention that Mr. Halter's performance was prejudicially deficient.[8]

---

8. If there is any evidence not in the record supporting the theory that trial counsel's performance was prejudicially defective, appellant certainly may bring a post-conviction proceeding where the matter can be litigated.

### III. *ISSUE 2*

██ Appellant also contends that the trial judge violated his constitutional right to counsel when the judge forced him to proceed to sentencing without a lawyer. In this appeal, the State acknowledges that that sentencing is a critical stage of the proceeding and that the defendant has a right to counsel when sentenced. *Id.* at 1448; *see also Gardner v. Florida,* 430 U.S. 349, 358, 97 S.Ct. 1197, 51 L.Ed.2d 393 (1977) (citing *Mempa v. Rhay,* 389 U.S. 128, 134, 88 S.Ct. 254, 19 L.Ed.2d 336 (1967)); *see also State v. Wischhusen,* 342 Md. 530, 537, 677 A.2d 595, citing *United States v. Cronic,* 466 U.S. at 656, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984) (trial is unfair if the accused is denied counsel at a critical stage of the trial). The State also acknowledges that the trial judge was inaccurate when he told appellant that appellant "did not have an absolute right to counsel like ... [he did] at the guilt or innocence phase of the trial."

Maryland Rule 4–215 reads, in pertinent part, as follows:

(a) **First appearance in court without counsel.** At the defendant's first appearance in court without counsel, or when the defendant appears in the District Court without counsel, demands a jury trial, and the record does not disclose prior compliance with this section by a judge, the court shall:

(1) Make certain that the defendant has received a copy of the charging document containing notice as to the right to counsel.

(2) Inform the defendant of the right to counsel and of the importance of assistance of counsel.

(3) Advise the defendant of the nature of the charges in the charging document, and the allowable penalties, including mandatory penalties, if any.

(4) Conduct a waiver inquiry pursuant to section (b) of this Rule if the defendant indicates a desire to waive counsel.

(5) If trial is to be conducted on a subsequent date, advise the defendant that if the defendant appears for trial without

counsel, the court could determine that the defendant waived counsel and proceed to trial with the defendant unrepresented by counsel.

\* \* \*

(d) **Waiver by inaction—Circuit court.** If a defendant appears in circuit court without counsel on the date set for hearing or trial, indicates a desire to have counsel, and the record shows compliance with section (a) of this Rule, either in a previous appearance in the circuit court or in an appearance in the District Court in a case in which the defendant demanded a jury trial, the court shall permit the defendant to explain the appearance without counsel. If the court finds that there is a meritorious reason for the defendant's appearance without counsel, the court shall continue the action to a later time and advise the defendant that if counsel does not enter an appearance by that time, the action will proceed to trial with the defendant unrepresented by counsel. If the court finds that there is no meritorious reason for the defendant's appearance without counsel, the court may determine that the defendant has waived counsel by failing or refusing to obtain counsel and may proceed with the hearing or trial.

In *State v. Brown,* 342 Md. 404, 426, 676 A.2d 513 (1996), the Court of Appeals was presented with the issue of whether the trial court was obliged to follow Maryland Rule 4–215 when (after trial had commenced) the defendant asked but was denied permission to discharge counsel. The *Brown* Court said that, once trial began, the dictates of Maryland Rule 4–215 no longer governed the proceedings, "although the court must still adhere to constitutional standards." *Id.* The *Brown* Court held that in order to follow "constitutional standards" the trial court was required to determine the reason for the requested discharge "before deciding not to allow the dismissal." *Id.* at 412, 676 A.2d 513.

By parity of reasoning, it is clear that, when a defendant appears at sentencing after his trial counsel has with-

drawn, the sentencing judge may not force an unrepresented defendant to proceed without counsel unless the court first gives the defendant a fair opportunity to explain why he or she has not retained new counsel.

At sentencing, appellant, for the most part, spoke through an interpreter. He said, at the outset, that he had been "trying to look for a good counsel...." Appellant then strayed to the subject of whether he was in fact guilty, whereupon the court reminded him that a jury had found him guilty. The court also reminded appellant that he had said, on the date that he was found guilty, that he would be retaining his own attorney for sentencing. The appellant started to reply, but the court interrupted by telling him that "you don't have an absolute right to counsel at sentencing like you do at the time of the guilt or innocence phase of a case," and therefore, he was denying appellant's (implied) request for a postponement. After misstating the law, the court asked appellant if it was correct that he had "made no effort to get counsel." The defendant said that he had made an effort to obtain counsel but then said, ambiguously, that he "did not feel comfortable speaking to them." Whether he was "uncomfortable" because of the language barrier, or for some other reason, is unclear. The court next asked appellant if he had spoken to anyone in the Public Defender's Office; when the defendant answered in the negative, the court concluded the discussion and, at least impliedly, decided that appellant had waived counsel by inaction.

Based on *Brown,* the sentencing judge was justified in failing to comply with the strict requirements of Rule 4–215. But, the court was still required to give appellant some meaningful opportunity to explain why he had not retained counsel and then make a decision as to whether the right to counsel had been waived by inaction. Here, appellant was afforded no such opportunity. And, as a consequence, we have no idea why counsel was not retained. Under these circumstances, we hold that appellant is entitled to a new sentencing hearing.

JUDGMENTS OF CONVICTIONS AFFIRMED; CASE REMANDED TO THE CIRCUIT COURT FOR CECIL COUNTY FOR RESENTENCING; COSTS TO BE PAID SEVENTY–FIVE PERCENT BY APPELLANT AND TWENTY–FIVE PERCENT BY CECIL COUNTY.